375 So.2d 239 (1979)
AMERICAN BENEFIT LIFE INSURANCE COMPANY
v.
Mark McINTYRE.
77-781.
Supreme Court of Alabama.
May 25, 1979.
Rehearing Denied August 17, 1979.
Robert M. Alton, Jr., W. Stephen Graves, Montgomery, for appellant.
M. R. Nachman, Jr., of Steiner, Crum & Baker, Montgomery, for appellee.
*240 James C. Barton, Birmingham, for amici curiae, Birmingham News Co. and Alabama Press Assn. on rehearing and en banc hearing.
PER CURIAM.
This is an appeal by plaintiff, American Benefit Life Insurance Company (American Benefit) from a summary judgment entered against it and in favor of defendant, Mark McIntyre. We reverse and remand.
On August 31, 1977 The Alabama Journal, a Montgomery, Alabama daily newspaper, published an article authored by defendant, Mark McIntyre, which dealt in pertinent part with a 1976 State Insurance Department report. The published article stated that:
"The Insurance Department report condemns various American Benefit operations. Among its charges are that the company had 6.2 million dollars less than needed to meet its liabilities in 1975." (emphasis added)
On September 21, 1977, there appeared in The Montgomery Advertiser, The Alabama Journal's sister daily, an article also written by McIntyre, which stated in part:
"Although the Department's report had found American Benefit insolvent by 6.2 million dollars in 1975, Payne [State Insurance Commissioner], as the result of the meeting granted a 4.5 million dollar increase in American Benefit 1976 assets." (emphasis added)
Counsel for American Benefit contacted McIntyre thereafter, pointed out the "falsity" of these statements, and demanded that the articles be retracted. McIntyre, through letter of counsel, responded to American Benefit by stating that the articles were well founded. He did not offer to retract. It appears that McIntyre based the statements principally upon the emphasized portion of the 1976 department report of examination (portions of which are set out below):
 Decatur, Alabama
Honorable Charles H. Payne
Commissioner of Insurance
State of Alabama
Montgomery, Alabama 36130
Dear Sir:
 Pursuant to your instructions and in accordance with the provisions of the Alabama
Insurance Statutes and the resolutions adopted by the National Association of
Insurance Commissioners, an examination has been made of the condition and affairs
of the
 AMERICAN BENEFIT LIFE INSURANCE COMPANY
 DECATUR, ALABAMA
at its Administrative Office located in the National American Life Building, 8225
Florida Boulevard, Baton Rouge, Louisiana and at its subsequent removal location in
the Mutual Savings Life Insurance Company Building, Decatur, Alabama as of
December 31, 1975. The Report of Examination is herewith submitted.
 * * *

Borrowed Money $3,463,197 and Interest Thereon ($47,954) $ 3,511,151
Mandatory Security Valuation Reserve 2,417,027
Due Bills Payable 36,363
Policy Lien Recoveries Not Distributed 787,108
 ___________
 Total Liabilities $38,442,406
Capital and Surplus
Capital Paid Up $ $ 2,285,201
Gross Paid In and Contributed Surplus 14,062,270
Treasury Stock (6,175,946)
Unassigned Surplus (7,715,214)
 ____________
Surplus 171,110
 ___________
 $40,898,717
 ===========

*241
 CAPITAL AND SURPLUS ACCOUNT
Capital and Surplus, December 31, Previous Year $12,440,060
Net Gain From Operations (2,787,017)
Net Capital Gains (Losses) (3,907,255)
Change in Non-Admitted Assets and Related Items 82,401
Change in Mandatory Securities Valuation Reserve (1,711,761)
Assets Received, Reinsurance, National Producers Life Insurance
Company 3,560,142
Liabilities Assumed, Reinsurance National Producers Life Insurance
Company (3,955,712)
Increase in Treasury Stock (1,264,547)
 ____________
 Capital and Surplus 12/31/75 $ 2,456,311
 ============

 * * *
 The unreconciled shares situations occurred during the years 1968 and 1970 on the
Louisiana Citrus Lands stock and the year 1970 on the Mutual Savings Life Insurance
Company stock.
 It should be noted that in all cases where a smaller number of shares was reported
than previously reported purchased, a higher book value per share was used to arrive
at the same total cost.
 The Mutual Savings stocks were not physically inspected during the previous
examination as all shares were sold in December of 1971 to Superfine Oil and Gas for
a collateral loan agreement. The previous report only reconciles the cost of shares
bought and sold during the prior three years.
 The Company's response to examiners requests for additional information is
attached as Exhibit "A" to this report. It says in effect that these matters were
resolved in the previous report and Commission's Order dated January 31, 1973 which
is attached as Exhibit "B" to this report. All records of that report, hearing and
subsequent Order were inspected by the examiners. None of these records indicate
any discussion of any missing stock certificates or incorrect inventories of stock made
by examiners. The Company's letter of December 8, 1972 in fact states the topics to
be discussed in this hearing. This letter is attached as Exhibit "C" to this report.
 Had this report of examination been physically conducted and completed immediately
upon close of business at December 31, 1975, the Company would have been
impaired or insolvent by $6,159,179, determined as follows:

Surplus per Report of Examination $ 171,110.00
1. Decrease of Artfer Note to the amount guaranteed at
 12/31 (which was only $5.6 million) $ 2,400,000.00
2. Unsecured loan to Louis J. Roussel which was paid subsequent
 to year-end $ 530,289.00
3. Assets which were pledged at December 31, 1975 for
 benefit of Superfine Oil & Gas Company $ 3,400,000.00
 ______________
 Total Decreases $ 6,330,289.00
 --------------
Surplus if Examination held at year-end Close of Business $(6,159,179.00)

 As pointed out in the appropriate section in the front of this report, one-third of
the members of the Board of Directors are not residents of Alabama.
 CONCLUSION
 In addition to the undersigned, Mr. Richard F.A. Gandt, Examiner of the Alabama
Department participated in this examination until his resignation effective July 14,
1976. The actuarial section of the report was verified by Mr. Robert Dobson of the
firm Milliman and Robertson, Inc.
 Fred L. Tackett, Examiner
 State of Alabama
 Department of Insurance
(emphasis added)
*242 American Benefit on October 13, 1977 brought this libel action against McIntyre based upon the excerpts from the articles of August 31 and September 21, 1977. After extensive affidavits, depositions and other materials were filed, and oral arguments heard, McIntyre moved for summary judgment which was granted. From that order American Benefit appeals.
The basic question in this case is whether summary judgment was properly granted.
The threshold question in a libel case is whether the person allegedly defamed is a public official, a public figure or a private individual under the constitutional meaning of those terms. Browning v. Birmingham News, 348 So.2d 455 (Ala.1977). That question is one of law for the court. Browning, supra.
McIntyre does not argue that American Benefit is a public official, but rather contends that it is a "public figure." Curtis Publishing Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) defined the category of "public figures" as those persons who do not hold public office but are "nevertheless intimately involved in the resolution of important public questions or, by reason of their fame, shape events in areas of concern to society at large." In Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) the United States Supreme Court explained this definition:
For the most part those who attain this status [public figures] have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. In either event, they invite attention and comment. Even if the foregoing generalities do not obtain in every instance, the communications media are entitled to act on the assumption that public officials and public figures have voluntarily exposed themselves to increased risk of injury from defamatory falsehood concerning them. No such assumption is justified with respect to a private individual. He has not accepted public office or assumed an "influential role in ordering society." [citation omitted] He has relinquished no part of his interest in the protection of his own good name, ... [See also Time, Inc. v. Firestone, 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976).]
We hold that an insurance company such as American Benefit is for purposes of our libel laws a "public figure." It cannot be successfully argued that a corporation whose dealings are subject to close regulation by our state government, and, indeed, whose very existence as an entity is owing to that government, does not invite attention and comment from the news media. The insurance business has long been held to be clothed with the public interest, German Alliance Ins. Co. v. Lewis, 233 U.S. 389, 34 S.Ct. 612, 58 L.Ed. 1011 (1914), and the power and influence of such a business over society cannot be ignored.
Having decided that American Benefit is a public figure, we now turn to a matter which is not one of law.
We have often held that summary judgment may be granted only when there is no genuine issue of a material fact and the moving party is entitled to judgment as a matter of law. Board of Water and Sewer Commissioners of the City of Mobile v. Alabama Power Company, 363 So.2d 304 (Ala. 1978); Isbell v. City of Huntsville, 295 Ala. 380, 330 So.2d 607 (1976). See Rule 56(c), ARCP. We hold in this instance that the movant has not carried his burden and summary judgment was improper. It is clear to this Court that the trial court should have found that there was at least one genuine issue of fact existing in light of the materials before it, keeping in mind the applicability of the scintilla rule to summary judgments. Browning, supra; Wilson v. *243 Liberty National Life Insurance Co., 331 So.2d 617 (Ala.1976); Loveless v. Graddick, 295 Ala. 142, 325 So.2d 137 (1975). In brief both parties vigorously discuss the issue of "actual malice," i. e., whether the statements were published with knowledge of their falsity or in reckless disregard of their truth or falsity. They recognize that if the plaintiff is a public figure and there is no scintilla of evidence to support a finding of actual malice then summary judgment for defendant would be proper regardless of whether the statement is false and defamatory. Bryan v. Brown, 339 So.2d 577 (Ala. 1976). This follows because "actual malice" is an essential element in an action involving a libeled public figure or official. New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); Curtis Publishing Co., supra; Gertz, supra.
In Loveless v. Graddick, supra this Court expressly embraced the explanation contained in Goldwater v. Ginzburg, 261 F.Supp. 784 (D.D.C.1966):
The issue of actual malice on the part of the defendants seems peculiarly inappropriate for disposition by summary judgment because it concerns "motive, intent, and subjective feelings and reactions."
The resolution of such an issue will generally depend upon observation of the demeanor of the defendant because, of course, the knowledge of his state of mind would generally reside exclusively with him. See 2 Lyons, Alabama Practice: Rule 56, at 349 (1973); 10 Wright & Miller, Federal Practice and Procedure: Civil § 2726, at 520, § 2730, at 582 (1973).
After this case was argued and submitted, the Supreme Court of the United States decided Herbert v. Lando, 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979). There, the Court stated:
"Civil and criminal liability for defamation was well established in the common law when the First Amendment was adopted, and there is no indication that the Framers intended to abolish such liability. Until New York Times the prevailing jurisprudence was that "[l]ibelous utterances [are not] within the area of constitutionally protected speech ..." Beauharnais v. Illinois, 343 U.S. 250, 266, 72 S.Ct. 725, 735, 96 L.Ed. 919 (1952); see also Roth v. United States, 354 U.S. 476, 482-483, 77 S.Ct. 1304, 1307-08, 1 L.Ed.2d 1498 (1957); Chaplinsky v. New Hampshire, 315 U.S. 568, 571-572, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942); Near v. Minnesota, 283 U.S. 697, 707-708, 51 S.Ct. 625, 628, 75 L.Ed. 1357 (1931). The accepted view was that neither civil nor criminal liability for defamatory publications abridge freedom of speech or freedom of the press, and a majority of jurisdictions made publishers liable civilly for their defamatory publications regardless of their intent. New York Times and Butts effected major changes in the standards applicable to civil libel actions. Under these cases public officials and public figures who sue for defamation must prove knowing or reckless falsehood in order to establish liability. Later, in Gertz v. Robert Welch, Inc., supra, the Court held that nonpublic figures must demonstrate some fault on the defendant's part and, at least where knowing or reckless untruth is not shown, some proof of actual injury to the plaintiff before liability may be imposed and damages awarded.
"These cases rested primarily on the conviction that the common law of libel gave insufficient protection to the First Amendment guarantees of freedom of speech and freedom of press and that to avoid self-censorship it was essential that liability for damages be conditioned on the specified showing of culpable conduct by those who publish damaging falsehood. Given the required proof, however, damages liability for defamation abridges neither freedom of speech nor freedom of the press.
"Nor did these cases suggest any First Amendment restriction on the sources from which the plaintiff could obtain the *244 necessary evidence to prove the critical elements of his cause of action. On the contrary, New York Times and its progeny made it essential to proving liability that plaintiffs focus on the conduct and state of mind of the defendant. To be liable, the alleged defamer of public officials or of public figures must know or have reason to suspect that his publication is false. In other cases proof of some kind of fault, negligence perhaps, is essential to recovery. Inevitably, unless liability is to be completely foreclosed, the thoughts and editorial processes of the alleged defamer would be open to examination.
"It is also untenable to conclude from our cases that, although proof of the necessary state of mind could be in the form of objective circumstances from which the ultimate fact could be inferred, plaintiffs may not inquire directly from the defendants whether they knew or had reason to suspect that their damaging publication was in error. In Butts, for example, it is evident from the record that the editorial process had been subjected to close examination and that direct as well as indirect evidence was relied on to prove that the defendant magazine had acted with actual malice. The damages verdict was sustained without any suggestion that plaintiff's proof had trenched upon forbidden areas.
"Reliance upon such state-of-mind evidence is by no means a recent development arising from New York Times and similar cases. Rather, it is deeply rooted in the common-law rule, predating the First Amendment, that a showing of malice on the part of the defendant permitted plaintiffs to recover punitive or enhanced damages. In Butts, the Court affirmed the substantial award of punitive damages which in Georgia were conditioned upon a showing of `wanton or reckless indifference or culpable negligence' or `ill will, spite, hatred and an intent to injure . . . .' 388 U.S., at 165-166, 87 S.Ct., at 1997. Neither Mr. Justice Harlan, id., at 156-162, 87 S.Ct., at 1997, nor Chief Justice Warren, concurring, id., at 165-168, 87 S.Ct., at 1996-1998, raised any question as to the propriety of having the award turn on such a showing or as to the propriety of the underlying evidence, which plainly included direct evidence going to the state of mind of the publisher and its responsible agents.
"Furthermore, long before New York Times was decided, certain qualified privileges had developed to protect a publisher from liability for libel unless the publication was made with malice. Malice was defined in numerous ways, but in general depended upon a showing that the defendant acted with improper motive. This showing in turn hinged upon the intent or purpose with which the publication was made, the belief of the defendant in the truth of his statement, or upon the ill will which the defendant might have borne towards the defendant [sic].
"Courts have traditionally admitted any direct or indirect evidence relevant to the state of mind of the defendant and necessary to defeat a conditional privilege or enhance damages. The rules are applicable to the press and to other defendants alike, and it is evident that the courts across the country have long been accepting evidence going to the editorial processes of the media without encountering constitutional objections.
"In the face of this history, old and new, the Court of Appeals nevertheless declared that two of this Court's cases had announced unequivocal protection for the editorial process. In each of these cases, Miami Herald Publishing Co. v. Tornillo, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974), and Columbia Broadcasting System v. Democratic National Committee, 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973), we invalidated governmental efforts to pre-empt editorial decision by requiring the publication of *245 specified material. In Columbia Broadcasting System, it was the requirement that a television network air paid political advertisements and in Tornillo, a newspaper's obligation to print a political candidate's reply to press criticism. Insofar as the laws at issue in Tornillo and Columbia Broadcasting System sought to control in advance the content of the publication, they were deemed as invalid as were prior efforts to enjoin publication of specified materials. But holdings that neither a State nor the Federal Government may dictate what must or must not be printed neither expressly nor impliedly suggest that the editorial process is immune from any inquiry whatsoever.
"It is incredible to believe that the Court in Columbia Broadcasting System or in Tornillo silently effected a substantial contraction of the rights preserved to defamation plaintiffs in Sullivan, Butts, and like cases. Tornillo and Gertz v. Robert Welch, Inc., were announced on the same day; and although the Court's opinion in Gertz contained an overview of recent developments in the relationship between the First Amendment and the law of libel, there was no hint that a companion case had narrowed the evidence available to a defamation plaintiff. Quite the opposite inference is to be drawn from the Gertz opinion, since it, like prior First Amendment libel cases, recited without criticism the facts of record indicating that the state of mind of the editor had been placed at issue. Nor did the Gertz opinion, in requiring proof of some degree of fault on the part of the defendant editor and in forbidding punitive damages absent at least reckless disregard of truth or falsity, suggest that the First Amendment also foreclosed direct inquiry into these critical elements.
"In sum, contrary to the views of the Court of Appeals, according an absolute privilege to the editorial process of a media defendant in a libel case is not required, authorized or presaged by our prior cases, and would substantially enhance the burden of proving actual malice, contrary to the expectations of New York Times, Butts and similar cases." (Footnotes omitted.)
The Court also noted, in connection with its holding that malice could be proven by showing that the defendant acted with improper motive, which "showing in turn hinged upon the intent or purpose with which the publication was made, the belief of the defendant in the truth of his statement, or upon the ill will which the defendant might have borne towards the [plaintiff]," the following:
"`The existence of actual malice may be shown in many ways. As a general rule, any competent evidence, either direct or circumstantial, can be resorted to, and all the relevant circumstances surrounding the transaction may be shown, provided they are not too remote, including threats, prior or subsequent defamations, subsequent statements of the defendant, circumstances indicating the existence of rivalry, ill will, or hostility between the parties, facts tending to show a reckless disregard of the plaintiff's rights, and, in an action against a newspaper, custom and usage with respect to the treatment of news items of the nature of the one under consideration. The plaintiff may show that the defendant had drawn a pistol at the time he uttered the words complained of; that defendant had tried to kiss and embrace plaintiff just prior to the defamatory publication; or that defendant had failed to make a proper investigation before publication of the statement in question. On cross-examination the defendant may be questioned as to his intent in making the publication.' " (Footnotes omitted.) At page 164, 99 S.Ct. at page 1643.
American Benefit argues, among other things, that the very report which McIntyre contends was the foundation for his statements supports the inference that McIntyre knew the statements were false. McIntyre's steadfast maintenance of his lack of malice has been strongly challenged by *246 American Benefit. In such an instance the credibility of the defendant, and the inferences his conduct might suggest to the trier of fact, are crucial. We catalog here some of the allegations of fact from which actual malice on McIntyre's part might reasonably be inferred:
(1) That the very report which McIntyre argues as the foundation for his statements supports the inference that McIntyre knew the statements were false because (a) the express terms of the report show that American Benefit actually enjoyed a surplus in 1975; (b) the language said by McIntyre to support his statements does not form a part of the report which establishes a surplus but is only personal comment of the examiner; (c) even the personal comments of the examiner establish that there was a surplus in American Benefit's financial picture in 1975.
(2) That the focus given by the articles to the personal, hypothetical comments of the examiner to the exclusion of the facts and figures of the actual financial report, shows actual malice.
(3) That the affidavits filed by the parties support the inference that McIntyre printed his articles knowing of their falsity or in reckless disregard of their truth or falsity because (a) McIntyre had access to the files and reports of the Insurance Department and in his own affidavit stated that he thought through considerable study he could "come to a meaning that probably was eighty, ninety-nine percent [exact]..."; (b) Deputy Insurance Commissioner Crawford had according to his deposition discussed with McIntyre, prior to the articles, the various items that appear in reports of examination of insurance companies and the treatment of each in such a report. At no time, he stated, was McIntyre told that American Benefit was insolvent, and in fact every effort was made to explain to McIntyre the true facts of American Benefit's report.
We hold from the materials before it that the trial court at the very least should have gleaned a glimmer, spark or scintilla of evidence which would present a triable issue of fact over whether the statements were published with knowledge of their falsity or with reckless disregard of whether they were false or not.
American Benefit's ability to establish the ingredients of malice as required by New York Times, may be difficult, but it is entitled to try. As the Court said in Herbert v. Lando:
"... It may be that plaintiffs will rarely be successful in proving awareness of falsehood from the mouth of the defendant himself, but the relevance of answers to such inquiries .. can hardly be doubted. To erect an impenetrable barrier to the plaintiff's use of such evidence on his side of the case is a matter of some substance, particularly when defendants themselves are prone to assert their good-faith belief in the truth of their publications, and libel plaintiffs are required to prove knowing or reckless falsehood with `convincing clarity.' New York Times v. Sullivan, 376 U.S., at 285-286, 84 S.Ct., at 729." (Footnotes omitted.)
The summary judgment must be reversed and the cause remanded and it is so ordered.
REVERSED AND REMANDED.
BLOODWORTH, MADDOX, FAULKNER, JONES and ALMON, JJ., concur.
TORBERT, C. J., and SHORES, EMBRY and BEATTY, JJ., dissent.
EMBRY, Justice (dissenting):

I
I respectfully dissent. The report of examination of the condition and affairs of American Benefit Life by the Department of Insurance states that had it been physically conducted and completed immediately upon the close of business 31 December 1975, American Benefit would have been impaired or insolvent to the extent of $6,159,179. Regardless of the fact that events occurring in 1976 caused the balance sheet of American Benefit to show a surplus, *247 a legitimate argument can be made to support McIntyre's statement that the company was insolvent in 1975. Certainly, it would be a rational interpretation of the report. Time, Inc. v. Pape, 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971). There is not a scintilla of evidence that the articles were published by McIntyre with Sullivan malice: knowledge that they were false or with reckless disregard of their truth or falsity.

II
Even had there been a scintilla of evidence of Sullivan malice, it would not have warranted submission of the case to a jury. The First Amendment to the Constitution of the United States and Article 1, § 4 of the Constitution of Alabama require more than a scintilla of evidence. Clear and convincing evidence must be shown in order for a public figure to surmount the summary judgment hurdle. This standard is qualitative as well as quantitative. Certainly no clear and convincing evidence of Sullivan malice was presented in the pleadings or affidavits of American Benefit. Moreover, summary judgment has repeatedly been held to be peculiarly applicable to defamation cases in which the Sullivan test must be met. See, e. g., Bon Air Hotel, Inc. v. Time, Inc., 426 F.2d 858 (5th Cir. 1970); Time, Inc. v. McLaney, 406 F.2d 565 (5th Cir.), cert. denied, 395 U.S. 922, 89 S.Ct. 1776, 23 L.Ed.2d 239 (1969); Perry v. Columbia Broadcasting System, Inc., 499 F.2d 797 (7th Cir.), cert. denied, 419 U.S. 883, 95 S.Ct. 150, 42 L.Ed.2d 123 (1974); Cervantes v. Time, Inc., 464 F.2d 986 (8th Cir. 1972), cert. denied, 409 U.S. 1125, 93 S.Ct. 939, 35 L.Ed.2d 257 (1973); Miller v. News Syndicate Co., 445 F.2d 356 (2d Cir. 1971); Thompson v. Evening Star Newspaper Co., 129 U.S.App.D.C. 299, 394 F.2d 774, cert. denied, 393 U.S. 884, 89 S.Ct. 194, 21 L.Ed.2d 160 (1968); Washington Post Co. v. Keogh, 125 U.S.App.D.C. 32, 365 F.2d 965 (1966), cert. denied, 385 U.S. 1011, 87 S.Ct. 708, 17 L.Ed.2d 548 (1967); Meeropol v. Nizer, 381 F.Supp. 29, 32 (S.D.N.Y.1974); Guitar v. Westinghouse Electric Corp., 396 F.Supp. 1042 (S.D.N.Y.1975).
The majority apparently places great weight on the importance of a jury determination of whether common law malice i. e., spite or ill will, is present. This type of malice is immaterial to a recovery and irrelevant to a showing of Sullivan malice. See National Association of Letter Carriers v. Austin, 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974); Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 52 n. 18, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971); Garrison v. Louisiana, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964). The majority relies heavily on a footnote from the recent United States Supreme Court decision in Herbert v. Lando (1979) 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115:
"See, e. g., 50 Am.Jur.2d § 455:
"`The existence of actual malice may be shown in many ways. As a general rule, any competent evidence, either direct or circumstantial, can be resorted to, and all the relevant circumstances surrounding the transaction may be shown, provided they are not too remote, including threats, prior or subsequent defamations, subsequent statements of the defendant, circumstances indicating the existence of rivalry, ill will, or hostility between the parties, facts tending to show a reckless disregard of the plaintiff's rights, and, in an action against a newspaper, custom and usage with respect to the treatment of news items of the nature of the one under consideration. The plaintiff may show that the defendant had drawn a pistol at the time he uttered the words complained of; that defendant had tried to kiss and embrace plaintiff just prior to the defamatory publication; or that defendant had failed to make a proper investigation before publication of the statement in question. On cross-examination the defendant may be questioned as to his intent in making the publication.' (Footnotes and citations omitted.)"
This footnote has been quoted out of context by the majority and thus for the wrong proposition. An examination of the sentences preceding the quoted footnote shows clearly that the U.S. Supreme Court was *248 defining malice as it was defined prior to New York Times v. Sullivan. Those sentences read:
"Furthermore, long before New York Times was decided, certain qualified privileges had developed to protect a publisher from liability for libel unless the publication was made with malice. Malice was defined in numerous ways, but in general depended upon a showing that the defendant acted with improper motive. This showing in turn hinged upon the intent or purpose with which the publication was made, the belief of the defendant in the truth of his statement, or upon the ill will which the defendant might have borne towards the defendant [sic]." (emphasis added)
In Lando, the Court further stated they found it inappropriate to review the relevancy of ill will to Sullivan malice. 441 U.S., at 177 n. 27, 99 S.Ct. 1635.
The majority of this court also relies on a statement from Goldwater v. Ginzburg, 261 F.Supp. 784 (D.D.C.1966), that actual malice "concerns `motive, intent, and subjective feelings and reactions.'" Unfortunately, this court quoted this statement with approval in Loveless v. Graddick, 295 Ala. 142, 325 So.2d 137 (1975). Although I concurred in Loveless, based on the facts in that case, I disagree with the statement that actual malice (Sullivan malice) concerns motive or intent. The U.S. Supreme Court has never held this to be true. Actual malice, as defined by that court, concerns knowledge and action taken despite that knowledge or lack of knowledge, not motive or intent.
The argument that summary judgment is inappropriate because malice is involved is groundless. Malice as commonly thought of is not involved. There is, therefore, no compelling reason for jury determination of this case. To the contrary, it is more appropriate for determination by summary judgment.
Because American Benefit has failed to show Sullivan malice under any standard of proof, and because the state and federal constitutions require that summary judgment be the rule rather than the exception in such cases, I would affirm the summary judgment entered by the trial court.
TORBERT, C. J., and SHORES, J., concur with Part I.
BEATTY, Justice (dissenting):
I dissent from the reversal of this case because of the absolute protection which I believe is given to the Press by the First Amendment. United States Constitution; Cf. Trans-Lux v. State ex rel. Sweeton, Ala., 366 So.2d 710, 717 (1978) (Beatty, J., dissenting). I concurred in the result of Mobile Press Register v. Faulkner, Ala., 372 So.2d 1282 (1979) for the same reason, although I did not comment there, preferring to wait until this opinion was released.
The First Amendment states that "Congress shall make no law ... abridging the freedom ... of the press...." This prohibition against Congress and our federal government interfering with the freedom of the Press has of course been made applicable to this state through the Fourteenth Amendment. Gitlow v. People of the State of New York, 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138 (1925); Edwards v. South Carolina, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963). The federal constitutional provisions are a fundamental floor beneath which state law may not fall. That this Court has failed to interpret the constitutional mandate according to the plain and literal meaning of its terms is regrettable. It has not refused to discharge its responsibility in this regard in the past. See e. g., Peddycoart v. City of Birmingham, Ala., 354 So.2d 808 (1978); Adams v. Mathis, Ala., 350 So.2d 381 (1977); Morgan County Commission v. Powell, 292 Ala. 300, 293 So.2d 830 (1974); Moore v. Stephens, 264 Ala. 86, 84 So.2d 752 (1956). I realize that our reluctance stems in part from the decisions rendered by the majority of the United States Supreme Court. However, as implied earlier, those decisions reflect only the bottom line, the minimum protection that is "constitutional." We are not bound to keep our state's protection to this minimum but are empowered through the *249 doctrine of federalism to provide more in the way of protection of these freedoms even to the extent of reading the Constitution the way it was written. I suspect that our founding fathers recognized as I do that the Press may be calculating, erroneous, ignorant, callous and indeed malicious, as well as informative, accurate, patriotic, sensitive and well-meaning. Nonetheless our founding fathers recognized and weighed such shortcomings against the advantages of an independent Press, and the result of their deliberation is clearly set forth in the First Amendment. Mr. Justice Black said it most cogently: "`No law' means no law." Justice Hugo Black and the First Amendment (1st Ed. 1978) at 70. My own reading of the First Amendment and my views on the fundamental relationship between government and our Constitution (set out in my dissenting opinion in Trans-Lux v. State ex rel. Sweeton, Ala., 366 So.2d 710 (1979) (Beatty, J., dissenting)) leads me to the same inescapable conclusion, that the First Amendment's Freedom of the Press is absolute! When we restrain the ability of the Press to comment on matters of public interest we weaken not merely the role of the Press but the very fabric of our democratic system; we lessen the very reason this nation and its government came into being as a unique creation, to protect and preserve the freedom of our people from whom all government is derived. With the long-term decrease in democratic governments throughout this world, we might take realistic heed to Mr. Justice Black's warnings about our own individual rights when he wrote: "There are grim reminders all around this world that the distance between individual liberty and firing squads is not always as far as it seems." Braden v. United States, 365 U.S. 431 (1961), at 445-446, 81 S.Ct. 584, at 593, 5 L.Ed.2d 653 (Justice Black dissenting).

ON REHEARING
PER CURIAM.
Able counsel for the parties and amici curiae have presented many persuasive arguments to this Court in connection with McIntyre's application for rehearing. The United States Supreme Court has rendered some recent decisions involving the law of defamation which were not available to us on original deliverance. We deem it advisable to extend our original opinion in this case and discuss these recent decisions of the Supreme Court of the United States as they apply to the issues presented.
McIntyre contends that Rule 56, which requires the application of the scintilla rule in determining whether a material issue of fact exists, could not be applied in a defamation case. We disagree. McIntyre urges us to employ a clear and convincing evidence test as espoused in New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). He also cites Mobile Press Register, Inc. v. Faulkner, 372 So.2d 1282 (Ala.1979), wherein this Court opined that the plaintiff must carry a burden of clear and convincing evidence in showing actual malice when the plaintiff is a public figure. We hold that neither New York Times v. Sullivan nor Mobile Press Register, Inc. v. Faulkner, requires the application of a clear and convincing evidence test on a motion for summary judgment when the plaintiff is a public figure. In fact, the instant case is distinguishable from New York Times v. Sullivan and Mobile Press Register, Inc. v. Faulkner, in that the plaintiff here appeals from the grant of a summary judgment. The burden on a movant in a summary judgment case involving libel continues to be grounded upon state law. Hutchinson v. Proxmire, __ U.S. ___, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979). Further, Hutchinson, at footnote 9, held "[t]he proof of `actual malice' calls a defendant's state of mind into question, New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and does not readily lend itself to summary disposition." (Emphasis added.) We hold that the summary judgment procedure which must be followed in libel cases is the same as in other caseswas there a genuine issue of a material fact?
Because of recent decisions of the United States Supreme Court, we also deem it advisable *250 to discuss whether American Benefit Life was a "public figure," as a majority of this Court found it to be on original deliverance. In Wolston v. Readers Digest Association, Inc., ___ U.S. ____, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979), the Supreme Court held that a "libel defendant must show more than mere newsworthiness to justify application of the demanding burden of New York Times."
Wolston, supra, employed a complex analysis in determining whether one is a "limited-purpose public figure." First, did the party voluntarily thrust or inject himself into the forefront of the public controversy surrounding the alleged libelous statements? One who is pursued by the government or unwillingly dragged into a controversy does not automatically become a public figure. The nature and extent of one's participation in the particular controversy giving rise to the defamation must be considered. The simple fact that certain events attract media attention is not conclusive.
Second, did the libeled plaintiff engage the attention of the public in an attempt to influence the resolution of the issues involved? Did he assume special prominence in the resolution of the issues involved or did he seek to arouse public sentiment in his favor? Did he enjoy significantly greater access than private individuals to channels of effective communication, which would enable him through discussion to proffer counter criticism and expose the falsehood and fallacies of defamatory statements?
In Wolston, supra, the Court noted that the plaintiff had been the subject of controversy during Soviet espionage investigations of the 1950's. However, he returned to a state of "relative obscurity" and "achieved no general fame or notoriety," nor did he assume a "role of special prominence in the affairs of society as a result of his contempt citation or because of his involvement in the investigation of Soviet espionage in 1958." Wolston's failure to respond to a grand jury's subpoena was held not to voluntarily thrust or inject himself into public controversy nor draw attention to himself in order to invite public comment or influence the public with respect to any issue.
Similarly, in Hutchinson, supra, the Court found that even though Hutchinson was a scientist who did research under federal government grants, published scientific research articles in professional journals, and even responded to the defendant's criticism in the press, those facts did not make him a public figure. The Court further noted Hutchinson had not assumed any role of public prominence in the area of concern (public expenditures for research), nor did he have "the regular and continuing access to the media that is one of the accouterments of having become a public figure."
We do not find any conflict herein with the previous conclusion in Mobile Press Register, Inc. v. Faulkner, supra, wherein this Court found Faulkner was a public figure, as a matter of law.
The question of whether the plaintiff insurance company here is a public figure for the purpose of the report discussed in McIntyre's articles is a question of law. Mobile Press Register, Inc. v. Faulkner, supra; Browning v. Birmingham News, 348 So.2d 455 (Ala.1977); Rosenblatt v. Baer, 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966).
Based on the guidelines set forth in Hutchinson, we find that American Benefit is a "limited-purpose public figure." The company was regulated by the State Insurance Commissioner. There is a public interest in such companies licensed by the state. By entering into such a business, a company has voluntarily subjected itself to public scrutiny. The investigation of the Insurance Commissioner is an expected incident of an insurance company's business. We do not find that the company was "dragged into" a controversy. American Benefit was the focal point of the investigation and the report from which McIntyre's articles stemmed.
Further, we find American Benefit attempted to resolve the issues involved. American Benefit had significant access to *251 the press before the subject news articles were printed. There was testimony that McIntyre tried to elicit comment from Louis J. Roussel, American Benefit's president, immediately after he met with the Insurance Commissioner, while he was en route to a meeting with Attorney General Baxley. McIntyre also tried to call Roussel several times before publication. Letters by Roussel, included in the record on appeal, claim he had ready access to the United States Senators and Representatives from the State of Louisiana and wielded influence through them. Certainly the vast contacts and influence of American Benefit's chief executive officer and principal stockholder indicate it had greater access than private individuals to channels of effective communication.
ORIGINAL OPINION EXTENDED; APPLICATION FOR REHEARING OVERRULED.
BLOODWORTH, MADDOX, FAULKNER, JONES and ALMON, JJ., concur.
TORBERT, C. J., and SHORES, EMBRY and BEATTY, JJ., dissent.
EMBRY, Justice (dissenting).
The recent United States Supreme Court cases to which the majority allude do not persuade me to change the views expressed by me in my dissent on original deliverance.