**BLUE RIDGE BANK, Plaintiff,**

v.

**VERIBANC, INC., Defendant.**

**Civ. A. No. 83–0683(R).**

United States District Court,
W.D. Virginia,
Roanoke Division.

Nov. 19, 1987.

---

R. Reid Young, Jr. and James W. Haskins, Young, Haskins, Mann, Gregory & Young, Martinsville, Va., for plaintiff.

L. Thompson Hanes, Woodward, Fox, Wooten & Hart, Roanoke, Va., for defendant.

## MEMORANDUM OPINION

TURK, Chief Judge.

This case is before the court on the defendant's post trial motions for a judgment notwithstanding the verdict, or for a new trial. Jurisdiction is based on diversity, and is proper in this court, as ruled by the Fourth Circuit in *Blue Ridge Bank v. Veribanc*, 755 F.2d 371 (4th Cir.1985). In September, the court presided over a four day trial in which a jury awarded Blue Ridge Bank $600,000.00 for damages caused by Veribanc's libel of the plaintiff.

### I. Facts

Blue Ridge Bank operated as a savings and loan institution in the town of Floyd, in Floyd County, Virginia until November 18, 1982. On that date it became a member bank of the federal reserve system, and accordingly became responsible for complying with the regulations of the Federal Reserve Board. The plaintiff generated wide spread publicity in Floyd County concerning its conversion to a commercial bank, in an effort to attract customers at a time when the savings and loan industry was having trouble.

Veribanc is a company based in Wakefield, Massachusetts that buys computerized information available from the Federal Reserve Board. Veribanc processes this information into a useful format, and then sells these reports to the public. Veribanc produces numerous reports routinely, as well as several individual reports that are requested on a one time basis. The report in issue was not generated as one of Veribanc's routine reports, but was generated by Veribanc and provided to syndicated newspaper columnist Dan Dorfman with the understanding that he would credit Veribanc as the source of his information if he used it. The report was purportedly a list of banks that, if they continued their present pattern as indicated by the figures released by the Federal Reserve Board for the fourth quarter of 1982, would reach

zero equity within twelve months. The figures were arrived at by taking the fourth quarter loss, as reported to the Federal Reserve, multiplying it by four to produce an annual loss figure, and comparing this figure to the bank's reported equity.

It was not disputed at trial that Blue Ridge Bank had, for the period ending in December 1982, filed a "call report" as required with the Federal Reserve, showing a substantial loss. The figure actually reported the total loss for the year 1982 incurred by the institution, both as a savings and loan, and as a commercial bank. According to testimony at trial from Mr. John W. Scott, an employee of the Federal Reserve Board, the report was filed in accordance with the regulations then in effect.

Veribanc, through its computer program, interpreted the loss reported by Blue Ridge Bank as being a quarterly loss, rather than an annual loss, because no figure had been reported for Blue Ridge Bank at the end of the third quarter. No third quarter figure had been reported because as a savings and loan, Blue Ridge Bank was not required to report to the Federal Reserve. Only after converting to a commercial bank was Blue Ridge Bank required to file these reports.

Veribanc asserted at trial that it had no way of knowing that the loss figure reported was actually an annual, instead of a quarterly, loss. The plaintiff strongly contested this claim.

As a result of this error, Veribanc grossly exaggerated Blue Ridge Bank's financial position, and included Blue Ridge Bank on its list of 126 banks "which could reach zero equity within one year." The fact that this calculation was in error was admitted at trial by Warren G. Heller, Treasurer and Director of Veribanc.

Veribanc provided its list of banks that could be in trouble to syndicated newspaper columnist Dan Dorfman. In sending the list to Mr. Dorfman, Veribanc couched its report with a number of caveats, including some warnings that: the list was based on preliminary data, had not been independently verified, other more current data

may be available, and the list was not an expression of opinion by Veribanc or the Federal Reserve that any of the banks were in trouble. Mr. Dorfman did not include all of Veribanc's caveats in his newspaper column, and when the *Richmond Times–Dispatch* published the column, it removed some of the caveats that Mr. Dorfman had included. The only place Blue Ridge Bank was mentioned in the article was in a table prepared by Veribanc listing the banks singled out as those that could reach zero equity within one year. Neither Mr. Dorfman nor the newspaper altered this table, except the newspaper published only those banks the paper felt to be of local interest. The table headings and contents were otherwise unchanged.

## II. Legal Standards

### 1) Public Figure

Any consideration of the law of libel starts, of necessity, with the case of *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

It was in this case that the court first differentiated between the proof required by a public official and a private person, to recover an award based on a defamation claim. The court considered the applicability of the *New York Times* decision to public figures in *Curtis Publishing v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), and to private persons in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

Defamation law has become more complex as the Court has recognized the necessity of curtailing the common law slander and libel causes of action to the extent they interfere with the freedoms of speech and press as guaranteed by the first amendment. *New York Times*, 376 U.S. at 268–69, 84 S.Ct. at 719–20. The court has considered and weighed many competing interests in developing the appropriate standards. As discussed in *Gertz*, 418 U.S. at 339–49, 94 S.Ct. at 3006–12, these include the need for a vibrant free press not unnecessarily inhibited by the threat of costly law suits, the need for open public discussion over matters that affect the public,

and "the individual's right to the protection of his own good name." *Id.* at 341, 94 S.Ct. at 3008. It is because of this last element that the press has not been granted absolute immunity.

In *Gertz*, the Supreme Court held that the states could define the appropriate standard of liability for media defendants sued by private individuals. Accordingly, if this court were to hold that Blue Ridge Bank was a private figure, it would look to Virginia law to determine the appropriate standard. For public figure and public official plaintiffs, the standard has been determined as a matter of federal constitutional law, *New York Times*, 376 U.S. 254, 84 S.Ct. at 710; *Curtis Publishing*, 388 U.S. 130, 87 S.Ct. 1975.

Whether or not a plaintiff is a public figure or public official is a question of law for the court to decide. *Rosenblatt v. Baer*, 383 U.S. 75, 85, 88, 86 S.Ct. 669, 675–76, 677, 15 L.Ed.2d 597 (1966); *Wolston v. Reader's Digest Assoc.*, 578 F.2d 427, 429 (D.C.Cir.1978), *rvsd. on other grounds*, 443 U.S. 157, 164, 99 S.Ct. 2701, 2705–06, 61 L.Ed.2d 450 (1979). The Court in *Gertz* described different situations in which a person could be deemed a public figure. Some public figures will have "assumed roles of especial prominence in the affairs of society.... occupy[ing] positions of ... persuasive power and influence." *Gertz* 418 U.S. at 345, 94 S.Ct. at 3009. It is more likely that the public figure will be one who has "thrust [himself] to the forefront of particular public controversies in order to influence the resolution of the issues involved." *Id.* The Court further stated that in determining whether a plaintiff is a public figure, an examination should be made into the "extent of [that party's] participation in the particular controversy giving rise to the defamation." *Id.* at 352, 94 S.Ct. at 3013.

The *Gertz* court also considered the plaintiff's access to the media, reasoning that a party with media access would be better able to mitigate any damage caused by a defamation. Private individuals having less access to the media would be less able to mitigate the damage, and are entitled to greater protection. *Id.*

The Fourth Circuit applied *Gertz* in determining whether the National Foundation for Cancer Research (hereinafter NFCR) was a public figure plaintiff in *National Foundation for Cancer Research v. Council of Better Business Bureaus*, 705 F.2d 98 (4th Cir.1983). The court examined the activity of the NFCR and held that where it had "thrust itself into the public eye" by aggressively seeking the public's attention through extensive advertising and solicitation campaigns, the NFCR was a public figure. The court specifically considered the *Gertz* dicta cited earlier concerning the necessity for a preexisting public controversy. The Fourth Circuit stated that it had to examine all of the plaintiff's actions in context, and that there was nothing to preclude the court from finding that the plaintiff itself had created the relevant public controversy, citing *Steaks Unlimited, Inc. v. Deaner*, 623 F.2d 264, 273–74 (3rd Cir.1980). *NFCR*, 705 F.2d at 101.

In *Steaks Unlimited*, the Third Circuit determined that there were two important considerations in determining public figures; the first was the party's access to the media, and the second and more important factor was whether the party has "effectively ... assumed the risk of potentially unfair criticism by entering into the public arena and engaging the public's attention." *Steaks Unlimited*, 623 F.2d at 273.

In the case before this court, the plaintiff had: extensively advertised its conversion to a commercial bank with media and direct mail campaigns, issued press releases, and sought local news coverage. By these actions the plaintiff "thrust itself into the public eye," and assumed the accompanying risk. As in *NFCR*, the plaintiff, through its own actions and advertising, created the relevant public controversy. These actions alone, however, may not be sufficient to raise the plaintiff to the status of a public figure.

The court finds it significant that the plaintiff is one of two commercial banks in Floyd County. As such, it cannot be denied that the welfare of the bank would be

of widespread public concern. Evidence at the trial showed that a substantial percentage of the money deposited in Floyd County was entrusted to Blue Ridge Bank.

Partly because of the important role banks play in our economy, and because they have such an important effect on the public welfare, the banking industry is highly regulated at state and national levels. In conducting their chosen business, banks are subject to public scrutiny and public discussion, which under the first amendment is entitled to be open and free from the threat of reprisal. Accordingly, banks do not receive the same protection from false accusations afforded to individuals or even businesses that do not operate in the public domain because such protection may "chill" free discussion. In *Coronado Credit Union v. KOAT Television, Inc.*, 99 N.M. 233, 656 P.2d 896 (1982), the New Mexico Court of Appeals held that since the public had a "vital interest" in knowing the solvency of a local credit union, the credit union was a public figure plaintiff. *See also American Benefit Life Insurance Co. v. McIntyre*, 375 So.2d 239 (Ala.1979) (insurance company chartered by the state and heavily regulated by the state is a public figure plaintiff); *Reliance Insurance Co. v. Barron's*, 442 F.Supp. 1341 (S.D.N.Y.1977) (insurance company which is closely regulated by the state and is offering its stock to the public is a public figure plaintiff).

The court holds that where 1) Blue Ridge Bank conducts business in a field of commerce closely affecting the public's welfare, 2) the banking industry is heavily regulated and open to public scrutiny, and 3) Blue Ridge Bank itself has actively sought the public's attention and has demonstrated its adequate access to the media channels, the plaintiff is a public figure for the purpose of this defamation action.

2) Actual Malice

■ Having held that the plaintiff is a public figure for the purpose of this action, the plaintiff must prove by clear and convincing evidence that the defamatory material was published with "actual malice."

*New York Times*, 376 U.S. 280, 285–86, 84 S.Ct. at 726, 728–29.

The defense has moved for a judgment notwithstanding the verdict, or for a new trial. In considering the motions, this court is governed by two different standards of review. On the motion for the judgment notwithstanding the verdict, this court must view the evidence in the light most favorable to the plaintiff, and must draw all reasonable inferences in the plaintiff's favor. The court cannot assess the witness' credibility or weigh the evidence. *Taylor v. Home Insurance Co.*, 777 F.2d 849, 854 (4th Cir.1985) (citations omitted). In considering the motion for a new trial, the court is permitted to weigh the evidence and assess the witness' credibility. *Id.* at 855.

Actual malice is defined as "knowledge that [the publication] was false or with reckless disregard of whether it was false or not." *New York Times*, 376 U.S. at 280, 84 S.Ct. at 726. In *St. Amant v. Thompson*, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968) the Court indicated that the reckless disregard standard is not the "reasonably prudent person" standard, but rather the defendant must be shown to have actually "entertained serious doubts as to the truth of his publication." *Id.* at 731, 88 S.Ct. at 1325. The Court, recognizing the burden this standard places on the plaintiff, went on to state that the defendant cannot escape liability merely by professing his good faith. The trier of fact must still decide whether the information was published in good faith. Evidence that the "publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation" could show the necessary degree of recklessness. *Id.* at 732, 88 S.Ct. at 1326.

The court, in considering the evidence presented to the jury, finds that the evidence was sufficient for the jury to find that the defendant acted with such disregard for the truth or falsity of his publication as to meet the "actual malice" threshold. It is significant that the jury during their deliberations asked the court to re-read the actual malice instruction, in-

dicating that the jury carefully considered the evidence in light of the actual malice standard.

The jury heard evidence from Dr. Sandridge, an expert in economics employed by the plaintiff, that the annualization method of predicting future losses, as applied by the defendant, was designed to be misleading. Dr. Sandridge testified that Veribanc used the figure they had mistakenly computed as Blue Ridge Bank's annual loss, and divided it by twelve months to arrive at a monthly rate of loss. This monthly rate, when compared to the Bank's reported equity, showed Blue Ridge Bank reaching zero equity in over fourteen months, which would have disqualified them from Veribanc's list of banks which will reach zero equity in less than a year. To reduce Blue Ridge Bank's number of "months to zero equity," Veribanc increased the monthly rate of loss by dividing the annual loss by nine months. By basing the rate of loss on a nine month year, rather than a twelve month year, Veribanc was able to include Blue Ridge Bank on its list of banks that would reach zero equity within one year.

Dr. Sandridge also testified that, in his opinion, the disclaimers used by Veribanc indicated that the defendant recognized the deficiencies in its methods. He stated that these disclaimers would not be normal practice for an economist.

There was also evidence that if the defendant had examined the "call report" from Blue Ridge Bank in much detail, it could have easily determined that the plaintiff was not a new bank, but was a converted savings and loan. The report showed that the majority of its loans were for local real estate and were too extensive to have been acquired within one quarter. Also, if the plaintiff bank had only been formed within the last quarter of 1982, as the defendant assumed, it would have had to pay forty percent interest on its savings accounts to report the figures shown on the call report. While "[f]ailure to investigate does not in itself establish bad faith" *St. Amant*, 390 U.S. at 733, 88 S.Ct. at 1326, citing *New York Times*, 376 U.S. at 287–88, 84 S.Ct. at 729–30, the defendant

here was guilty of more than merely failing to investigate. Not only did Veribanc fail to independently investigate the accuracy of its final conclusion, it also failed to use all the information initially in its possession to draw an accurate conclusion regarding the status of Blue Ridge Bank.

### III. Conclusion

In reviewing the evidence presented to the jury, the court finds that a reasonable person would conclude that the defendant, Veribanc, Inc., was reckless in its disregard for the truth or falsity of the information it published concerning the plaintiff, Blue Ridge Bank. The court also finds that this evidence meets the burden required in order for a public figure plaintiff to recover. Accordingly, the court will affirm the jury verdict in favor of the plaintiff for $600,-000.00. The court also denies the defendant's remaining post trial motions as being without merit.