429 So.2d 937 (1983)
David MARION, et al.
v.
Jim HALL.
80-867.
Supreme Court of Alabama.
February 11, 1983.
Rehearing Denied April 8, 1983.
*938 Thad Yancey, Jr. of Cervera & Yancey, Troy, and David M. Olive of McMillan & Spratling, Birmingham, for appellants.
Wyman O. Gilmore, Grove Hill, and John B. Crawley, Troy, and Irvin J. Langford of Howell, Johnston, Langford, Finkbohner & Lawler, Mobile, for appellee.
JONES, Justice.
Jim Hall, Jr., former Special Assistant to the President of Troy State University, and former Dean of the University's School of Journalism sued:
1. David Marion, publisher of The Troy Messenger, a daily newspaper published in the City of Troy, Alabama;
2. J.F.H. Corporation, a domestic corporation responsible for publication of The Troy Messenger;

3. Troy Publishing Corporation, Inc., owner of The Troy Messenger;

4. State Senator Mike Weeks; and
5. J. Frank Helderman, Jr., owner of all the capital stock of the Troy Publishing Corporation, Inc.
Hall sued for $2,000,000.00 damages in a complaint demanding a trial by jury, and alleging the wrongful, intentional, or malicious interference with his trade, profession or business, as a professor of journalism at Troy State University, resulting in his discharge from the University. The jury returned a verdict in favor of Hall against all defendants for $250,000.00 damages. The trial judge entered judgment.
Following entry of judgment, the defendants moved on April 24, 1981 for a JNOV or, in the alternative, a new trial. The motion contained 45 grounds, which, primarily, were bottomed on the sufficiency of the evidence to support the verdict. On July 24, the trial court denied the motion and, on July 30, defendants filed a supplemental motion for JNOV or in the alternative for a new trial alleging that defendants' activities were protected by the First Amendment to the United States Constitution, citing New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710,11 L.Ed.2d 686 (1964). This was the first instance of claiming First Amendment protection by the defendants. The defendants' answer did not raise the First Amendment issue, and the case was not tried on any issue other than wrongful, intentional, or malicious interference with a trade, profession, or business. It does not appear that the trial judge ever considered the supplemental motion. No order on the motion appears in the record.
*939 So, first things being first, we will dispense with the constitutional issue raised in this appeal by stating that we will not consider it. This Court held in Cooper v. Green, 359 So.2d 377 (Ala.1978), that it will not consider constitutional questions which were not raised in the Court below. See also, Howard v. Pike, 290 Ala. 213, 275 So.2d 645 (Ala.1973), and Smith v. State, 280 Ala. 241, 192 So.2d 443 (Ala.1966).
We return now to the principal issues in this case: (1) Was there a wrongful interference with Hall's profession at Troy State? and (2) was there sufficient evidence to support the verdict of the jury and judgment of the trial court? The answers entail a somewhat lengthy presentation of the facts.
At the time this litigation arose Hall had been employed at Troy State University for five and one-half years; he was drawing an annual salary of $30,672.00; he was a special assistant to the University President, Dean of the School of Journalism, and Director of Communication Services. He was a member of the supervisory board over the The Tropolitan, the University newspaper, and was in charge of public relations for the University.
In the autumn of 1979, Hall, his wife, and two other persons formed a domestic corporation to publish a weekly newspaperThe Pike County Leader. Hall was president of the corporation and personally owned 25% of its stock while his wife owned an additional 25%. Hall was author of a weekly column and personally edited some articles.
It is undisputed that J. Frank Helderman, Jr. is the President and owner of 100% of the stock in J.F.H. Corporation. J.F.H. corporation owns all of the stock in Troy Publishing Corporation, Inc., where David Marion is president and publisher of The Troy Messenger, a local newspaper.
Mr. Helderman testified that he personally furnished editorial direction and advice under the management contract with Troy Publishing Corporation. Helderman stated, and Marion verified, that Marion had to clear with Helderman before spending any money for the Troy Messenger over $5,000.00. Helderman also testified that he retains control of the endorsement of state candidates. Mike Weeks, an Alabama State senator from the Troy District, had received support for election from The Troy Messenger.
Mr. Helderman testified that when the Troy Publishing Corporation pays its management fee to J.F.H. Corporation, the money is deposited in J.F.H. Corporation's account in the American National Bank of Gadsden, Alabama, loosely referred to as "the operating account." He testified that his signature and his controller's signature are necessary to withdraw money from the account. He testified that he has the authority to hire and fire the controller. He testified there is another account in the American National Bank of Gadsden which he calls the "central funds account." All surplus funds not needed to operate Troy Publishing Corporation are transferred into the "central funds account."
Helderman further testified that he called David Marion on October 3, 1979, and David Marion called him around the same time about a letter that Marion was going to send to Dr. Ralph Adams, President of the University, about Jim Hall. Marion testified that Helderman advised him not to send a letter but to make an oral complaint.
David Marion testified that he knows Asa Dudley, the general manager of WTBF radio station and also knows David Price, the general manager of WRES-FM radio station; that he did call Asa Dudley on the telephone immediately before October 5, 1979, and ask Mr. Dudley if he could include his name in a draft of the letter that he was writing to Dr. Adams, and Marion said:
A. "... I mentioned in one of the final drafts of the letter that among other things I felt that it [The Pike County Leader] would pose an economic threat, let's say ... to the media already in existence then."
Marion then stated that Mr. Dudley did not care to be identified with the letter. Marion further testified as follows:

*940 Q. "All right. Did you subsequently, within a matter of a day of the time you first called Asa Dudley, did you call him back and tell him quote that you had been advised not to send the letter, but to make an oral presentation instead?
A. "That is correct.
Q. "Who madewho advised you not to send the letter, but to make an oral presentation instead?
A. "Mr. Helderman.
Q. "Oh. Then you did consult with Mr. Helderman about making a complaint about the Plaintiff in this case before you made the complaint, is that correct?
A. "That is correct."
Senator Weeks testified that he first became involved with Jim Hall and his association with The Pike County Leader when David Marion informed him of the problem. The only person he could name that complained about Jim Hall's involvement with The Pike County Leader was David Marion. His testimony further shows that the idea that Jim Hall had a conflict of interest originated with David Marion. Mike Weeks testified that he met David Marion in 1974 when he first came to Troy; that David Marion talked him into running for State Senator; that The Troy Messenger endorsed Mike Week's candidacy for the State Senate.
After talking with David Marion, Senator Weeks also felt that Hall had placed himself in a conflict of interest between his duties at the University and his management of The Pike County Leader. Senator Weeks contacted Melvin Cooper of the Alabama Ethics Commission; Dr. Adams, President of Troy State University; and Dr. James D.C. Robinson, Executive Vice-President of Troy State University, concerning the matter. Senator Weeks wrote the following letter to Ken Hendricks, a co-incorporator, co-officer, and co-director with Jim Hall, with copies to Dr. Adams and Dr. Robinson:
"November 15, 1979
"Mr. Kenneth Hendricks
P.O. Box 163
Troy, Alabama 36081
"Dear Ken:
"I am surprised that you have tried to reach me by telephone and have been unable to because I do have a recorder call system on my phone because I am aware of the tremendous amount of time I have to be away from my office to cover seven counties. In the future I hope that you will call and leave a message because I will try to get back to you as soon as possible.
"Whether or not there is a legitimate basis for my complaint lodged with Colonel Robinson at Troy State University or not is irrelevant. In my opinion, Mr. Jim Hall is Troy State University and anything he involves himself in in the free enterprise system is a direct reflection on Troy State University. I have personally said on many occasions that I have no qualms whatsoever about Jim Hall going into the newspaper business if he will resign his position from Troy State University. I would have the same feeling if I was the Dean of Insurance and had an insurance agency on the side or if I knew that Johnny Long had a music shop downtown Troy, and although neither may not be shirking their responsibilities we would still be "Troy State University" and I feel this is detrimental not only to Troy State University but to Pike County and all of my constituents. As long as I have to defend Troy State on budget hearings and any other matters I feel that the people associated with Troy State University should conduct themselves in a manner so that there will be no doubt in anyone's mind. If Jim Hall has time to start a newspaper on the side then maybe there is no need for a School of Journalism at all at Troy State University, and I can assure you I am looking into this matter at present.
"I already have information that leads me to believe that Jim Hall's association with the Pike County Leader, Inc. has made use of some of the students who are involved in the School of Journalism. Regardless of this, I still feel that he is a Dean of Troy State University, therefore, *941 employed by Troy State University and should conduct any outside business interests he might have on a very low profile and certainly not going into the newspaper publishing business which, in my opinion, although legitimate is definitely a conflict of interest. As far as my constituents are concerned I have talked with many in Troy over the past few weeks and I have yet to have one, except you because of your personal involvement, who has not felt that Jim Hall should stay at Troy State University or if he wants to go into the newspaper business he should resign and do so full time.
"I appreciate you taking the time to write me, and if I can be of further help to you do not hesitate to give me a call.
 "Sincerely,
 "/s/Mike
 "Mike Weeks
 "MW/jm
 "cc: Col. J.D. Robinson
 Executive Vice President
 Troy State University
 Troy, Alabama 36081
 Dr. Ralph Adams
 President
 Troy State University
 Troy, Alabama 36081"
On October 24, 1979, Hall was called to Dr. Robinson's office concerning Hall's alleged conflict of interest with the University and his newspaper, The Pike County Leader. At trial, Hall testified that during the course of that meeting Dr. Robinson told him as follows:
"... told me that if I did not resign from the university that I would be terminated. It stunned me. I didn't know what to do. So he saysI said, `On what basis do you want me to resign, because I don't feel like that I am in a conflict situation.' He says, `I can't put this university in a position of alienating a state senator who has to vote on an eight million dollar budget for this university no matter what the university might think of him personally and I can't put the university in a position of being in cross purposes with the local newspapers.' He says they own a lot of newspapers, and I can't put the university in that position. I asked him. `Are you taking this action based on two complaints?' And, he said, `yes'."
On October 26, Troy State University sent Hall a notice of proposed termination to become effective November 21. The conflict of interest in the duties created by Hall's recently established private enterprise, The Pike County Leader, was the reason stated for the termination.
Ken Hendricks testified that, after Jim Hall met with Dr. Robinson on October 24 and after Dr. Robinson's letter dated October 26, 1979, giving notice of proposed termination to Jim Hall, Hendricks talked with Hall about Hendricks meeting with Dr. Adams and Dr. Robinson and trying to resolve the matter. Hendricks also testified that a short time later he met with Dr. Adams and Dr. Robinson. He further testified as follows:
A. "[I told Dr. Adams] we have a problem and I would like to find a solution to the problem if there is a solution to be found and what can we do about it, and Dr. Adams' response to that was, that as far as I am concerned, if you can get David Marion and Mike Weeks to withdraw their complaints Jim can stay on at the University.
Q. "And after you received that response did you go call upon David Marion?
A. "Yes, I did.
Q. "Did he withdraw his complaint?
A. "No.
Q. "Did you also contact Senator Weeks?
A. "Yes.
Q. "Were you able to contact him?
A. "Not by phone or face to face. I contacted him by letter."
After Kenneth Hendricks was unsuccessful in getting David Marion and Mike Weeks to withdraw their complaints, he testified that he met again with Dr. Robinson to see what other course could be taken to resolve the matter. He testified that Dr. Robinson told him:

*942 "The only way he [Jim Hall] could stay on as the Dean of the School of Journalism was if he would transfer his stock to somebody else. His stock in the newspaper. I asked Dr. Robinson specifically if transferring his stock to Martha Hall would accomplish what he wanted done. He said that it would not, that it had to be somebody other than Martha Hall. I said can it be anybody other than Martha Hall, what about another relative? He said another relative is fine as long as it is not Martha Hall, because she is on the staff of the University, also. So we reached an agreement that day that if I could persuade Jim to transfer his stock to another individual other than Martha Hall, any other individual, and confirm to him in writing that that had been done and that Jim could stay on as the Dean of the School of Journalism and the problem would be solved in effect."
Mr. Hendricks then wrote to Dr. Robinson the following letter:
"Dear Robby:
"This is to notify you that Jim Hall has transferred his stock in the Pike County Leader, Inc., to his mother, Mrs. Hazel Kemp Hall. He is no longer a stockholder in that corporation and is no longer in any way connected with the Pike County Leader. I have requested Jim correspond with you directly confirming this termination and hereby confirm my intention to continue to have the Pike County Leader operate as it is now structured.
"I trust these terms satisfy my portion of our verbal agreement of November 13 and request you notify me when the matter is concluded to the satisfaction of the University.
"Once again may I reiterate my strong feelings about Jim's integrity regarding a conflict of interest and that I do not feel one existed or would have developed. I am anxious, however, to work closely with you and all members of the Troy State University faculty and staff in the growth and development of the University and of Pike County. It is that desire which brings me to alter the original plans of our corporation in order to eliminate any question anyone might have.
"Thank you again for your cooperation in working out a solution. I look forward to hearing from you regarding the withdrawal of your request for Jim's resignation and any action toward his termination. May we work together for many years in positive actions in furthering common goals.
"Sincerely,
"/s/Ken
"Kenneth Hendricks"
Hendricks further testified that the next thing that occurred was Jim Hall's termination in spite of the agreement with Dr. Robinson.
Hall called as a witness Melvin Cooper, Executive Director of the Alabama State Ethics Commission. Cooper, whom Mr. Helderman's lawyer recognized as an expert in state government in regard to ethics and professional responsibility of state officials and state employees, testified in response to the statement of hypothetical situations that Hall had no conflict of interest in this case.
On November 21, the notice of termination was sent to Hall. Hall subsequently filed his complaint on February 2, 1980, stating a cause of action "for the willful, intentional and malicious interference with plaintiff's trade, business or profession" which resulted in plaintiff's being fired by Troy State University. Hall further avers that defendants, Mike Weeks, David Marion, and J.F.H. Corporation by and through its agent David Marion, made unjustified and unfounded complaints about the plaintiff to James D.C. Robinson, Vice President of Troy State University, and Dr. Ralph Adams, President of Troy State University; and that defendants Mike Weeks, David Marion, and J.H.F. Corporation, by and through its agent David Marion pressured, coerced and/or requested James D.C. Robinson and Dr. Ralph Adams to fire the plaintiff from his employment with Troy State University, unless the plaintiff terminated his interest in a local newspaper, The Pike County Leader.
*943 One of the two principal issues in this case concerns whether there was a wrongful interference with Hall's profession at Troy State.
In Thompson v. Allstate Insurance Co., 476 F.2d 746 (5th Cir.1973), the Court stated, at page 748:
"[A]s we read the cases, they have consistently held that, prima facie, a cause of action for intentional interference with another's business is established by showing: (1) an intentional act of interference and (2) some consequential harm to the plaintiff's business. See Sparks v. McCrary [156 Ala. 382, 47 So. 332], supra; Carter v. Knapp Motor Co. [243 Ala. 600, 11 So.2d 383], supra; Kelite Products v. Binzel, 5 Cir.1955, 224 F.2d 131."
See, also, Byars v. Baptist Medical Centers, Inc., 361 So.2d 350 (Ala.1978). Defendants argued below that Hall did not prove these elements, and moved for a directed verdict, which was denied. Their subsequent motion for a judgment notwithstanding the verdict was also denied.
Citing Harville v. Goza, 393 So.2d 988 (Ala.1981), defendants allege that there are two standards of review, one for motions for directed verdict and the other for motions for judgment notwithstanding the verdict. Defendants state that on motion for directed verdict if there is a scintilla of evidence to support the action, then the case must go to the jury, but that to survive a motion for judgment notwithstanding the verdict, there must be sufficient evidence to support the verdict. This Court, however, in Ex parte Bennett, 426 So.2d 832 (Ala.1982), said that Harville v. Goza, does not correctly state the law in Alabama and should not be followed. This Court in Ex parte Bennett concluded that "it is the law in Alabama that the same standard applies to both a motion for a directed verdict and a motion for JNOV," and that a scintilla of evidence is sufficient to defeat either motion.
We conclude that, under the evidence presented, Hall has proven his cause of action for malicious interference with his trade, profession, or business. The directed verdict and JNOV were correctly denied by the trial court.
Finally, defendants assert that the jury's verdict is excessive. This Court in S.S. Kresge Co. v. Ruby, 348 So.2d 484 (Ala.1977), stated:
"This court has laid down the principle that a verdict will not be disturbed as excessive where the trial court has refused to disturb the amount unless so excessive as to indicate passion, prejudice, corruption or mistake. Montgomery City Lines v. Davis, 261 Ala. 491, 74 So.2d 923. And we have held that the correctness of a jury's verdict is strengthened when the presiding judge refused to grant a new trial." South Highlands Infirmary v. Camp, 279 Ala. 1, 7, 180 So.2d 904, 909 (1965). Moon v. Nolen, 294 Ala. 454, 318 So.2d 690 (1975); Louisville & N. R.R. Co. v. Dollar, 294 Ala. 276, 314 So.2d 867 (1975).
We cannot find that the preponderance of the evidence is so clearly against the verdict as to justify reversal nor can we find that the amount is so excessive as to indicate passion, prejudice, corruption, or mistake.
The judgment of the trial court is affirmed.
AFFIRMED.
BEATTY and ADAMS, JJ., concur.
TORBERT, C.J., concurs specially, joined by ALMON and SHORES, JJ.
EMBRY, J., dissents.
MADDOX and FAULKNER, JJ., recuse themselves.
TORBERT, Chief Justice (concurring specially).
I write because appellants, in their brief, assert that statements made by Appellant Weeks during his investigation of a purported problem at Troy State University should properly be characterized as activity within the sphere of legitimate legislative activity, which is protected under Section 56 of the Alabama Constitution. Appellant Weeks was, at the times pertinent to this *944 case, a State Senator representing District 23.
Article IV, § 56, of the Alabama Constitution provides: "[F]or any speech or debate in either house [members of the legislature] shall not be questioned in any other place." Neither have we been directed to, nor have I been able to find, any decisions involving an interpretation of Art. IV, § 56. The United States Supreme Court, however, has interpreted a virtually identical provision contained in Art. I, § 6, of the United States Constitution. The Court in United States v. Brewster, 408 U.S. 501, 507, 92 S.Ct. 2531, 2535, 33 L.Ed.2d 507 (1971), noted the import of the Speech or Debate Clause:
"The immunities of the Speech or Debate Clause were not written into the Constitution simply for the personal or private benefit of Members of Congress, but to protect the integrity of the legislative process by insuring the independence of individual legislators."
Legislative immunity extends beyond mere statements made in the legislative chambers. In United States v. Brewster, supra, the court stated: "It is beyond doubt that the Speech or Debate Clause protects against inquiry into acts that occur in the regular course of the legislative process and into the motivation for those acts." 408 U.S. at 525, 92 S.Ct. at 2544. The Court in Brewster, however, rejected the broader test of coverage under the Speech or Debate Clause urged in that case, that the Clause protects from inquiry all conduct "related to the due functioning of the legislative process." United States v. Brewster, supra, 408 U.S. at 513, 92 S.Ct. at 2538. The Court, instead, observed:
"It is well known, of course, that Members of the Congress engage in many activities other than the purely legislative activities protected by the Speech or Debate Clause. These include a wide range of legitimate `errands' performed for constituents, the making of appointments with Government agencies, assistance in securing Government contracts, preparing so-call `news letters' to constituents, news releases, and speeches delivered outside the Congress. The range of these related activities has grown over the years. They are performed in part because they have come to be expected by constituents, and because they are a means of developing continuing support for future elections. Although these are entirely legitimate activities, they are political in nature rather than legislative, in the sense that term has been used by the Court in prior cases. But it has never been seriously contended that these political matters, however appropriate, have the protection afforded by the Speech or Debate Clause. Careful examination of the decided cases reveals that the Court has regarded the protection as reaching only those things `generally done in a session of the House by one of its members in relation to the business before it,' Kilbourn v. Thompson, supra, [103 U.S. 168] at 204 [26 L.Ed. 377], or things `said or done by him, as a representative, in the exercise of the functions of that office,' Coffin v. Coffin, 4 Mass. 1, 27 (1808)."
408 U.S. at 512-13, 92 S.Ct. at 2537-38. The Court concluded that the Speech or Debate Clause protects only an act which is "clearly a part of the legislative process the due functioning of the process." 408 U.S. at 516, 92 S.Ct. at 2539.
It appears to me that legitimate legislative inquiry, even outside debate on the legislative floor, would be privileged at least to the extent of a qualified privilege. See, Browning v. Birmingham News, 348 So.2d 455 (Ala.1977). In Tenney v. Brandhove, 341 U.S. 367, 377-78, 71 S.Ct. 783, 788-89, 95 L.Ed. 1019 (1951), the Supreme Court stated:
"Investigations, whether by standing or special committees, are an established part of representative government. Legislative committees have been charged with losing sight of their duty of disinterestedness. In times of political passion, dishonest or vindictive motives are readily attributed to legislative conduct and as readily believed. Courts are not the *945 place for such controversies. Self-discipline and the voters must be the ultimate reliance for discouraging or correcting such abuses. The courts should not go beyond the narrow confines of determining that a committee's inquiry may fairly be deemed within its province. To find that a committee's investigation has exceeded the bounds of legislative power it must be obvious that there was a usurpation of functions exclusively vested in the Judiciary or the Executive."
In their brief, appellants refer us to the custom and practice whereby the legislators whose districts include colleges and universities are called upon by their fellow representatives for advice and information. Appellants state that reliance on local legislators is more common with smaller universities, such as Troy State, since legislative committees lack the funds and support staff to conduct investigations into the operations of these schools.
A question is presented as to whether Senator Weeks's actions were indeed legitimate legislative activities or were "political" activities which are not protected under the Speech or Debate Clause. Had this question been properly raised and presented to the trial court, that issue would be properly before this Court on appeal. A review of the pleadings and of the trial court's order, however, compels the conclusion that the issue of legislative immunity was not raised in the lower court. We, therefore, cannot consider appellant's argument on this point.
ALMON and SHORES, JJ., concur.
EMBRY, Justice (dissenting):
I am compelled again to dissent because of the majority's holding with respect to both the Sullivan First Amendment rule's protection of defendants' activities and, lo, once again, that monster the so-called scintilla rule. They err with regard to both, but I shall be brief because, it seems, mine is a cry in the wilderness. The First Amendment requires a higher standard of proof before a case may be submitted to a jury on facts made actionable because of utterances, whether verbal, written, or pictorial in nature. This case arose from some of those type activities. See Sullivan; New York Times Co. v. Connor, 365 F.2d 567 (5th Cir.1966), and their progeny which include cases extending those protections to public figures. E.g., Mobile Press Register, Inc. v. Faulkner, 372 So.2d 1282 (Ala.1979).
Let me now devote a few words to that multifaceted gem of amorphousness and agility: scintilla. How long, oh how long are the courts to be inundated with meritless actions where juries, motivated by emotion, are submitted factual issues for decision supported only by this scintilla fellow, whoever he may be? Without further elaboration, notwithstanding Goza, I would hold the standard to be applied regarding the directed verdict by the trial court as that which we apply in reviewing motions for JNOV.