482 So.2d 257 (1985)
John W. PEMBERTON
v.
The BIRMINGHAM NEWS COMPANY, a corporation, and Mark Winne.
83-766.
Supreme Court of Alabama.
November 22, 1985.
Rehearing Denied January 10, 1986.
*258 John W. Haley of Hare, Wynn, Newell & Newton, Birmingham, for appellant.
James C. Carton, Gilbert E. Johnston, Jr., and Hollinger F. Barnard of Johnston, Barton, Proctor, Swedlaw & Naff, Birmingham, for appellees.
BEATTY, Justice.
Plaintiff John W. Pemberton appeals from the trial court's entry of judgment notwithstanding the verdict (JNOV) in favor of defendant The Birmingham News Company (hereinafter "the News" or "the defendant") in a libel suit. We affirm.
On Saturday, August 8, 1981, the News featured an article on its front page entitled "House Clerk helps arrange paroles, News-launched investigation reveals." The article, written by defendant Mark Winne,[1] revealed the results of Winne's investigation into the parole system and focused on information concerning plaintiff, clerk of the Alabama House of Representatives. Plaintiff's picture accompanied the article. A second article "Long wait, delays ... call came" also appeared on the front page and dramatized Winne's undercover activities in paying $3,000 to a middleman to obtain a parole for an inmate, $1,500 of which was ultimately given to plaintiff.
Two other articles dealing with the same subject were printed on the front page of that edition of the newspaper. One article reported the arrest of Andrew Cooper, deputy commissioner of the Alabama prison system, on charges of bribery and violation of ethics laws in connection with the parole of an inmate. The second article "Paroles for Sale?" announced that the News had been investigating possible irregularities in the parole system for two months and was beginning a series of articles on the subject. Neither of the latter two articles referred to the plaintiff.
Plaintiff filed suit against Winne, the News, and other parties unknown, alleging that defendants had libeled him. At the trial, the court overruled defendants' motion for directed verdict at the close of plaintiff's case. At the close of all the evidence, the trial court overruled both the defendants' and the plaintiff's motions for directed verdict. The jury returned a verdict exonerating Winne but finding the News liable for damages in the amount of $75,000. Judgment was entered in accordance with the verdict. Later, however, the trial court granted the motion of the News for JNOV and entered judgment in favor of the News. In doing so, the trial court found that plaintiff had not presented clear and convincing evidence of actual malice on the part of the defendants in writing and publishing the news stories or in drafting and publishing the headlines.
On appeal, plaintiff argues: (1) that the trial court applied the wrong standard of review in ruling on defendant's motion for JNOV; and (2) that, applying the correct *259 standard, there was sufficient evidence from which the jury could find actual malice.

I. Standard of Review
In New York Times Co. v. Sullivan, 376 U.S. 254, 279-80, 84 S.Ct. 710, 725-26, 11 L.Ed.2d 686 (1964), the United States Supreme Court announced the rule that a public official could not recover damages "for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with `actual malice' that is, with knowledge that it was false or with reckless disregard of whether it was false or not." Proof of actual malice must be made by clear and convincing evidence. Mobile Press Register, Inc. v. Faulkner, 372 So.2d 1282, 1288 (Ala.1979). There is no dispute in this case that plaintiff, as clerk of the Alabama House of Representatives, is a public official required to prove actual malice under the New York Times standard. This controversy centers on the standard which the trial and appellate courts should use in determining the merits of defendant's motion for JNOV and on whether there was sufficient evidence of actual malice in this case to uphold the jury verdict.
Ordinarily, the same standard applies to both a motion for directed verdict and a motion for JNOVa scintilla of evidence is sufficient to defeat either motion. Marion v. Hall, 429 So.2d 937, 943 (Ala.1983); Rule 50(e), A.R.Civ.P. In accord with this rule, plaintiff contends that the trial court erred in granting JNOV for the News if there was a scintilla of evidence of actual malice.
However, in Bose Corp. v. Consumers Union of United States, Inc., 466 U.S. 485, 104 S.Ct. 1949, 1965, 80 L.Ed.2d 502 (1984), the Supreme Court held that the first amendment requires appellate judges to decide independently of the trier of fact whether there is clear and convincing proof of actual malice in the record. Although the Court noted that it had frequently applied the rule of independent appellate examination of the record to cases arising in state courts, in Bose the Court resolved the apparent conflict between that rule and Rule 52(a), Federal Rules of Civil Procedure, which provides that findings of fact should not be set aside unless clearly erroneous. The Court decided that the rule of independent appellate review "is a rule of federal constitutional law." 466 U.S. at 510, 104 S.Ct. at 1965.
In reaching its decision in Bose, the Court relied upon its decisions in the related first amendment area of obscenity, 466 U.S. 506-510, 104 S.Ct. at 1963, such as Jenkins v. Georgia, 418 U.S. 153, 154-55, 94 S.Ct. 2750, 2752, 41 L.Ed.2d 642 (1974), in which the Court had reviewed a Georgia Supreme Court decision affirming the appellant's conviction for distributing obscene material. The Court in Jenkins stated:
"Appellee contends essentially that under Miller [v. California, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973)] the obscenity vel non of the film `Carnal Knowledge' was a question for the jury, and that the jury having resolved the question against appellant, and there being some evidence to support its findings, the judgment of conviction should be affirmed. We turn to the language of Miller to evaluate appellee's contention.
"Miller states that the questions of what appeals to the `prurient interest' and what is `patently offensive' under the obscenity test which it formulates are `essentially questions of fact.' 413 U.S. at 30, 93 S.Ct. at 2618....
"...
"But all of this does not lead us to agree with the Supreme Court of Georgia's apparent conclusion that the jury's verdict against appellant virtually precluded all further appellate review of appellant's assertion that his exhibition of the film was protected by the First and Fourteenth Amendments. Even though questions of appeal to the `prurient interest' or of patent offensiveness are `essentially questions of fact,' it would be a serious misreading of Miller to conclude that juries have unbridled discretion in determining what is `patently offensive.'..." 418 U.S. at 159-160, 94 S.Ct. at 2754.
After its independent review, the Court held that as a matter of constitutional law, *260 the film could not be found to be obscene. In a separate opinion, Justice Brennan stated: "After the Court's decision today, there can be no doubt that Miller requires appellate courtsincluding this Courtto review independently the constitutional fact of obscenity." 418 U.S. at 163, 94 S.Ct. at 2756 (Brennan, J., concurring in the result).
We have no doubt that federal constitutional law requires us to review the record independently of the trier of fact to determine not whether there was a scintilla of evidence, but whether there was clear and convincing evidence presented on the constitutional fact of actual malice in a defamation case. This does not mean, however, that we ignore the jury verdict. It is entitled to some weight, especially on matters involving the credibility of witnesses. Widener v. Pacific Gas & Electric Co., 75 Cal.App.3d 415, 433, 436, 142 Cal.Rptr. 304, 313, 315 (1977), cert. denied, 436 U.S. 918, 98 S.Ct. 2265, 56 L.Ed.2d 759 (1978).
We have previously held that the scintilla rule is applicable on a motion for summary judgment in a defamation case. American Benefit Life Ins. Co. v. McIntyre, 375 So.2d 239, 249 (Ala.1979) (opinion on rehearing). We find it incongruous for the sufficiency of the evidence to be measured in a libel case involving a public figure by different standards at different stages of the proceedings. In view of the Bose case and our decision today, McIntyre should no longer be followed. We now hold that for purposes of trial motions, posttrial motions, and appellate review in a libel case involving a public official or a public figure actual malice must be shown by clear and convincing evidence.
Therefore, we turn now to the evidence of actual malice presented in this case.

II. Actual Malice
The following facts concerning defendants' investigation underlying the stories about plaintiff are relevant to an inquiry into actual malice.
In the spring of 1981, partially as the result of a controversial parole of an inmate, the News decided to investigate the parole system in Alabama. Winne was the reporter assigned to the story, and Clark Stallworth, an associate editor of the News, was assigned to supervise and monitor Winne. Winne gathered information from inmates, parolees, and parole board employees. He was not allowed to see files of the parole board but parole board employees gave him information from the files in response to his questions. Winne was allowed to review files of the Alabama State Ethics Commission. In reviewing the Ethics Commission files, Winne discovered the cases referred to in the article in which plaintiff had filed a disclosure indicating that he was representing an inmate. In one disclosure letter, plaintiff stated he was representing Leon Starr. Employees of the parole board told Winne they were unable to find a file for this inmate; however, after the articles were published, a file was located for George Leon Starr.
During his investigation, Winne met James King, a former prison inmate. Using an assumed identity, Winne pretended to be interested in securing a parole for an inmate, James Harding. King stated that he knew a high official in state government who could arrange a parole for $3,000 but that the arrangements must be kept "under the table."
After discussing the information with his editors, Winne contacted Tom Krebs, head of the Governor's Task Force on Crime and Corruption. Winne and Stallworth met with Krebs and other state officials at a motel in Clanton. After the meeting, Krebs arranged for the governor's office to provide Winne with $3,000 to give to King.
Following a series of telephone calls, Winne and King arranged to meet on Saturday, August 1, at the post office in Birmingham. Law enforcement authorities monitored this meeting and taped the conversations between King and Winne. At the post office, Winne insisted on speaking to the official by telephone. King put Winne on the telephone with someone. John Hendrix, head of the intelligence unit of the Department of Public Safety, later concluded from tapes of the conversation that the voice on the telephone was not *261 plaintiff's voice. After speaking on the telephone, Winne gave King the money.
King was followed by law enforcement officers. He and his wife traveled to a barber shop in Midfield and then to a restaurant for dinner. After dinner, they went to a used car lot in Tarrant, where King used part of the money to purchase a pickup truck. When King and his wife returned home without delivering the money, the decision was made to arrest King for theft by deception. During his interrogation, King named Ealon Lambert, chairman of the parole board, as his contact. King was told that he could be sent back to prison without the possibility of parole, under the Habitual Offender Act, and that his wife could be convicted as an accomplice. King said that he would cooperate with the authorities.
King and his wife were taken to a Birmingham motel for the night. The next morning, King broke into tears and admitted that his contact was not Lambert but was plaintiff, John Pemberton. After being taken to Montgomery, King telephoned plaintiff and requested that he come to a motel room. The transcript of the telephone conversation reveals that plaintiff agreed to meet King to "chat a little bit," without any explanation of the reason for the meeting.
The following excerpts are from the August 2 meeting between plaintiff and King:
"MR. KING: I notice, ah, you got your man Mr. Ealon [Lambert] going back with the [Pardon and Parole] Board, John.
"MR. PEMBERTON: Well, old Ealon's been a friend of mine. Well, Sara [Sellers] was a good girlthey're going to have a problem with that new man. Hell, he won't let anybody out.
"MR. KING. Huh.
"MR. PEMBERTON: Shit, I Just as well give up trying over there, Jim. I don't have any luck anymore.
"MR. KING: Don't you think uh, Ealon will work with you?
"MR. PEMBERTON: Oh, EalonEalon's got some damn sense. That man they put on over there he ain't got any sense.
"MR. KING: Huh.
"MR. PEMBERTON: He thinks, shit, everybody ought to be in jail for at least two or three years.
"MR. KING: Huh. Well, I'll tell you what I got. I had a hard time getting the money from this boy because he wantedjust kept insisting that he meet you, and I said, no, the man don't want to meet ya. So I got three thousand dollars from him, with a thousand dollars he pays a week before he's released, and I brought you fifteen hundred. I took myself outI took out fifteen hundred and got myself out of hock because I've been down, John. And so I told you I would bring you that just as soon as the man put it in my hands.
"MR. PEMBERTON: Jim, I tell you what, now, I'll fight it. I'm going to Well, I'm going to represent the guy, but I can'tI mean, you charge him what you want because I can't split fees that's bad ethicsyou know what I mean? I don't want to lose my license, so you justyou know what I mean?
"MR. KING: Yes, sir.
"MR. PEMBERTON: But I'll be glad to do anything I can for him and
"MR. KING: Well, I know you've got to have expenses, I know that. So ah, I know that for sure, and I wouldn't feel right taking it and not giving you something. I told you I'd bring it to you as soon as I got it, and I'm a man of my word, ain't I?
"MR. PEMBERTON: Well, what's that guy's name? Now that's what I'm charging.
"MR. KING: James Harding.
"MR. PEMBERTON: I'll leave the other up to you and him, right?
"MR. KING: Right.
"MR. PEMBERTON: Because I mean, under the law, I can't split no damn fees and I don't want your cut. I don't want to lose my license, but I'm going to do everything I can for him. You know that. James what?

*262 "MR. KING: James Harding. He got that hold over in Jefferson County squared away.
"MR. PEMBERTON: H-a-r-d-i-n-g?
"MR. KING: H-a-r-d-i-n-g.
"MR. PEMBERTON: Jefferson County?
"MR. KING: Right.
"MR. PEMBERTON: All right, I'll do what I can.
"MR. KING: John, II've got a good possibility of two more that's not as hard as this one. Don't have that much time, but I've got
"MR. PEMBERTON: Well, like I told you, Jim, you know, this is the absolute truth. I can't even split a fee with a lawyer. So I'll help youI mean, I'll help the guy anyway I possibly can.
"MR. KING: Good.
"MR. PEMBERTON: And if he pays me, then that's it.
"MR. KING: Well, I appreciate whatI know you want to make money, and I don't want you to have to have expensesspread a little around. And I appreciate what you are giving me.
"MR. PEMBERTON: But I ain't giving you nothing.
"...
"MR. KING: Well, these other two, are you interested in meeting `em and talking to `em or you just want me to work it?
"...
"MR. PEMBERTON: Hell, this life is too short. If I canif I can help him legally, you know I'll do it.
"MR. KING: Right.
"MR. PEMBERTON: But I'll go on and talk to `em and if they canif from a lawyer's point of view if I can help `em, you know I'll be glad to.
"...
"MR. PEMBERTON: Well, I'll do whatever I can, but if I can't help this fellowI mean, I'll give this back."
It was undisputed at trial that plaintiff took the $1,500 from King.
At the conclusion of the King-Pemberton meeting, Ray Acton, attorney for the Department of Public Safety, instructed the law enforcement officers not to arrest plaintiff. The tapes of the meeting were reviewed by law enforcement authorities. Winne was present at that time. Although there was some disagreement among the authorities, they decided to concur in Acton's decision not to arrest plaintiff because the evidence at that time did not present a prosecutable case.
On Thursday, August 6, Winne and Stallworth met again at a Clanton motel with various law enforcement officials. Montgomery County District Attorney James Evans requested that the News delay any story about its investigation until after the arrest of Andrew Cooper, so that Cooper would not become alarmed. Stallworth and Winne agreed to delay the series.
On Friday, August 7, King called plaintiff at approximately 7:00 a.m. and said that Harding's uncle was "bugging" him about Harding's case. Plaintiff agreed to meet with the uncle. Plaintiff also said that he had talked to Lambert about the case and was waiting for Lambert to call him back. Shortly after this telephone conversation, law enforcement authorities arranged for Harding to call plaintiff. During that conversation, plaintiff denied that he had received any money from King but stated that King had promised to bring him a retainer. Later in the conversation, when Harding asked if plaintiff needed more money, plaintiff responded, "I don't need any money, period.... If I can help you or King, I'll make the phone call and I'll be glad to do it. I don't want no money." Plaintiff then called King and stated: "That boy called me.... He started asking me all kinds of damn questions." Plaintiff arranged to meet King and Harding's uncle that morning, but King later cancelled the meeting, using his health as the excuse.
Winne was in Montgomery on Friday, August 7, for the Andrew Cooper arrest. He arrived back in Birmingham around midnight and began working on a draft of the Pemberton story. Stallworth arrived at the News offices about 3:00 a.m., Saturday, August 8, and discussed with Winne *263 the urgency of beginning the parole series, since Cooper had been arrested. Stallworth reviewed Winne's article and insisted that he contact plaintiff for his comments before publishing the story.
At approximately 5:00 a.m., Winne called plaintiff. After Winne identified himself, the following colloquy took place:
"MR. WINNE: Okay. We are getting ready to do a storywe've been told that you accepted $500$1,500, excuse me, to arrange a parole for a man named James Harding, a state prison inmate.
"MR. PEMBERTON: James Harding, I don't even know a James Harding.
"MR. WINNE: You have never talked to a James Harding?
"MR. PEMBERTON: James Hardingsomebody called me yesterday morning. I don't even know him.
"MR. WINNE: What did he call you about?
"MR. PEMBERTON: He called me and asked me if I had done any work for him. I said, `Who are you?'
"MR. WINNE: You have not taken any money on his case?
"MR. PEMBERTON: No, no.
"MR. WINNE: You are not his attorney?
"MR. PEMBERTON: No, I don't even know him.
"MR. WINNE: Do you know a man named King?
"MR. PEMBERTON: King?
"MR. WINNE: Yeah.
"MR. PEMBERTON: Yeah, I know a man named King.
"MR. WINNE: Did he contact you on that Harding case?
"MR. PEMBERTON: He has called me about somebody but I don't know any details.
"MR. WINNE: Okay. Do you handlehave you handled other cases before the Parole Board?
"MR. PEMBERTON: Well, practicingduring my law practice, I try to handle some but very few.
"MR. WINNE: These peoplethese sources who are giving me this are saying that you had planned to go through Ealon Lambert.
"MR. PEMBERTON: Go through Ealon Lambert?
"MR. WINNE: To arrange his parole.
"MR. PEMBERTON: I don't know what in the hell he's talking about. You've got to go through theyou've got to have a hearing and go through a proceeding with all three members just like a lawsuit and try.
"MR. WINNE: Uh, did youcan you be certain you have not talked with King about this Harding?
"MR. PEMBERTON: I have talked to King about the possibility of representing Harding, but I have neverI am not.
"MR. WINNE: You are not?
"MR. PEMBERTON: No.
"MR. WINNE: And you have not taken any money?
"MR. PEMBERTON: No. I wouldn't know Harding if he walked in the room.
"MR. WINNE: Okay. When is the last time you met Mr. King?
"MR. PEMBERTON: I haven't seen Mr. King in quite some time.
"MR. WINNE: A year?
"MR. PEMBERTON: Let's seeit would probably be three or four years."
Later in the conversation, plaintiff stated that he had not contacted anyone at the parole board to inquire about Harding. Winne then asked plaintiff about parolees to whom reference is made in the lead article. Plaintiff offered no explanation when informed that the parole board had no record of a Leon Starr.
Winne then called Lambert, who stated that plaintiff had inquired about the possibility of a parole for Harding and was told that it was unlikely Harding would be paroled any time soon.
The article was then approved for publication.
"Actual malice" is defined as knowledge of the falsity of a statement or reckless disregard of whether the statement is true or false. New York Times Co. v. Sullivan, 376 U.S. at 279-80, 84 S.Ct. at *264 725-26. In St. Amant v. Thompson, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968), the Court stated:
"[R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice."
Of course, if the published statements are true, there is no cause of action for defamation and no need to inquire about malice.
At trial, the attorneys for defendants cross-examined plaintiff about the articles paragraph by paragraph. Plaintiff was unable to point to anything in the articles which he personally knew to be untrue as of the time of publication. In reviewing the motion of the News for JNOV, the trial court specified two erroneous statements. First, the article stated:
"Additionally, a Montgomery County grand jury, The News has learned, has been held over into a special session by District Attorney Jimmy Evans, and will issue subpoenas Monday to several banks throughout the state for Pemberton's bank records to search for information on his dealings with the parole board."
The subpoenas were never issued. Both Winne and Krebs testified that, at the August 6 meeting in Clanton, Evans stated that he would subpoena plaintiff's bank records as well as the bank records of several other state officials. Evans testified that he did not recall whether he discussed that possibility at the Clanton meeting, but admitted that he had subpoenaed Cooper's bank records after his arrest.
Second, the article stated: "Another well-placed source said Pemberton regularly called the board about prisoners, sometimes up to 20 times a month." The trial court noted that parole board members testified that they had no knowledge of plaintiff's calling that often. Plaintiff admitted in his deposition that he got calls every day from members of the House of Representatives requesting that he check on inmates from their district and that he called the parole board often to inquire about the status of those inmates.
Assuming that these statements in the article were erroneous, we agree with the trial court's conclusion that the jury could not infer actual malice on the part of the News based on these errors. The trial court observed that Winne was the investigative reporter who did the research and authored the challenged statements. The jury verdict exonerating Winne is necessarily based on the conclusion that either the statements are essentially accurate or there was insufficient evidence that they were written by Winne with malice. There was no evidence that anyone else employed by the News had knowledge of facts unknown to Winne or had any reason unknown to Winne to seriously doubt the truth of the statements. Therefore, a finding that the News acted with malice in publishing the story would be inconsistent with the jury verdict for Winne. Moreover, from our own independent examination of the record, we do not find clear and convincing evidence of actual malice on the part of the News based on these two allegedly misleading statements in the article.
Plaintiff contends that the headline, which was not written by Winne, conveys the false impression that plaintiff was involved in an illegal or unethical scheme of buying and selling paroles. Plaintiff argues that actual malice on the part of the News in publishing the headline can be inferred from its reliance on an unreliable source, its failure to investigate the story properly before concluding that plaintiff was guilty, and its rejection of evidence favorable to plaintiff.
Plaintiff argues that the News exhibited reckless disregard for whether the accusation was true or not by relying on King's assertion that plaintiff was his high state official who could arrange a parole "under the table" for $3,000. Plaintiff cites King's *265 status as an exconvict, his lying about taking all of the money directly to the state official, and his changing the name of his contact from Lambert to Pemberton as indications of King's unreliability ignored by the News.
In Curtis Publishing Co. v. Butts, 388 U.S. 130, 135, 87 S.Ct. 1975, 1981, 18 L.Ed.2d 1094 (1967), the Saturday Evening Post published an article accusing Butts, the athletic director of the University of Georgia, of conspiring to fix a football game between the University of Georgia and the University of Alabama. The article revealed that a source had accidentally overheard a conversation between Butts and the Alabama coach in which Butts outlined Georgia's defense strategy. 388 U.S. at 136, 87 S.Ct. at 1981. In the companion case, Associated Press v. Walker, a news dispatch was distributed which accused Walker of leading a charge against federal marshals and encouraging rioters to use violence at the University of Mississippi to prevent the enrollment of a black student. After deciding that the plaintiffs could recover if they showed that the media defendants' actions were "highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers,"[2] Justice Harlan, writing for the plurality, concluded that Butts had made such a showing while Walker had not. 388 U.S. at 155-56, 87 S.Ct. at 1991-92.
The following facts regarding Burnett, the source of the information in Butts, were determinative:
"The Saturday Evening Post knew that Burnett had been placed on probation in connection with bad check charges, but proceeded to publish the story on the basis of his affidavit without substantial independent support. Burnett's notes were not even viewed by any of the magazine's personnel prior to publication. John Carmichael who was supposed to have been with Burnett when the phone call was overheard was not interviewed. No attempt was made to screen the films of the game to see if Burnett's information was accurate, and no attempt was made to find out whether Alabama had adjusted its plans after the alleged divulgence of information.
"The Post writer assigned to the story was not a football expert and no attempt was made to check the story with someone knowledgeable in the sport. At trial such experts indicated that the information in the Burnett notes was either such that it would be evident to any opposing coach from game films regularly exchanged or valueless. Those assisting the Post writer in his investigation were already deeply involved in another libel action, based on a different article, brought against Curtis Publishing Co. by the Alabama coach and unlikely to be the source of a complete and objective investigation." 388 U.S. at 157-58, 87 S.Ct. at 1992-93.
The Court found the following facts important in the companion case:
"In contrast to the Butts article, the dispatch which concerns us in Walker was news which required immediate dissemination. The Associated Press received the information from a correspondent who was present at the scene of the events and gave every indication of being trustworthy and competent. His dispatches in this instance, with one minor exception, were internally consistent and would not have seemed unreasonable to one familiar with General Walker's prior publicized statements on the underlying controversy." 388 U.S. at 158-59, 87 S.Ct. at 1993.
Chief Justice Warren's opinion concluded that these facts regarding the sources and investigative techniques justified a finding *266 of actual malice in Butts but not in Walker. 388 U.S. at 165, 169-70, 87 S.Ct. at 1998-99 (Warren, C.J., concurring in the result).
In St. Amant v. Thompson, 390 U.S. 727, 732, 88 S.Ct. 1323, 1326, 20 L.Ed.2d 262 (1968), the Court observed that a defendant's assertion that he believed the defamatory statement to be true would not always be a sufficient defense. The Court stated:
"Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." (Emphasis added.)
See also Vandenburg v. Newsweek, Inc., 507 F.2d 1024, 1027-28 (5th Cir.1975); Trapp v. Southeastern Newspapers, 10 Media L.Rptr.1985 (S.D.Ga. June 7, 1984).
In the present case, the News did not rely solely on King's statements. It contacted law enforcement authorities and participated in an investigation into plaintiff's dealings with the parole board. The fact that King was an exconvict did not diminish his credibility in this situation, but rather made it more probable that he would have inside information about how to obtain a parole "under the table." Although the News knew that King spent half of the $3,000 rather than taking it all to his contact, it also knew that plaintiff had accepted $1,500 as his fee and had told King that King would have to work out his fee with Harding. Similarly, although King changed his story after originally incriminating Lambert, the News knew that plaintiff had expressed no surprise at being contacted by King about a parole and had taken $1,500 from him. Finally, the fact that the person King called from the Birmingham post office was not plaintiff loses its significance in view of the later transactions between King and plaintiff. We find that the reliance by the News on King's statements was reasonable under the circumstances.
Plaintiff maintains that the News acted with actual malice in failing to investigate the subject more thoroughly. Plaintiff argues that this story was not "hot news" and, therefore, that there was time for a proper investigation which would have exonerated him.
"Failure to investigate does not in itself establish bad faith." St. Amant v. Thompson, 390 U.S. at 733, 88 S.Ct. at 1326. "However, when an article is not in the category of `hot news,' that is, information that must be printed immediately or it will lose its newsworthy value, `actual malice may be inferred when the investigation for a story ... was grossly inadequate in the circumstances'" Hunt v. Liberty Lobby, 720 F.2d 631, 643 (11th Cir.1983) (quoting Vandenburg v. Newsweek, Inc., 441 F.2d 378, 380 (5th Cir.), cert. denied, 404 U.S. 864, 92 S.Ct. 49, 30 L.Ed.2d 108 (1971), appeal after remand, 507 F.2d 1024 (5th Cir.1975)).
In Hunt, an article appeared on the front page of a weekly newspaper under the headline: "CIA TO NAIL HUNT FOR KENNEDY KILLING." The article was continued on another page where a larger headline stated: "CIA TO `ADMIT' HUNT INVOLVEMENT IN KENNEDY SLAYING." Hunt, 720 F.2d at 634. The text of the article reported that there was a plot within the CIA to frame Hunt for the assassination of President Kennedy. The author of the article did not testify at trial, nor did either party take his deposition. Employees of the defendant company testified that they relied upon the author's reputation and his confidence in the reliability of his sources in publishing the story without any independent verification. They also testified, however, that they knew the author had been involved in litigation with the CIA and that this fact caused them to question what the author wrote. The eleventh *267 circuit held that reliance on the author without verification was unreasonable. The court held that actual malice could be inferred from the failure to investigate, the inherent improbability of the story, and the inference from the headlines that Hunt had in fact killed Kennedy.
Similarly, in Alioto v. Cowles Communications, Inc., 519 F.2d 777, 780-81 (9th Cir.1975), cert. denied, 423 U.S. 930, 96 S.Ct. 280, 46 L.Ed.2d 259 (1975), the appellate court held there was evidence of actual malice in that there was evidence that the authors of the story had doubts about the veracity of their sole source but deliberately failed to cross-check on the validity of his statements because they did not want to find them to be untrue. However, in Reveley v. Berg Publications, Inc., 601 F.Supp. 44, 46 (W.D. Texas 1984), the court found that the author of an allegedly defamatory article was at most negligent in relying upon his own memory of unverified statements contained in an earlier published article, and that the publisher was negligent in not verifying the facts. The court granted the defendants' motion for JNOV. See also McNabb v. Oregonian Publishing Co., 69 Or.App. 136, 685 P.2d 458, review denied, 297 Or. 824, 687 P.2d 797 (1984), cert. denied, ___ U.S. ___, 105 S.Ct. 1193, 84 L.Ed.2d 339 (1985).
In the present case, we do not find it necessary to decide whether the story was "hot news." We note that Stallworth and Winne felt that it was important to break the story when they did due to the arrest of Cooper. However, assuming, arguendo, that this was not "hot news," we find insufficient evidence for a jury to conclude that the investigation was grossly inadequate under the circumstances. Winne spent over two months on the investigation talking to parolees, inmates, and parole board employees. He reviewed Ethics Commission files and requested information from parole board files. When he did get a source, he notified law enforcement authorities and turned the investigation over to them. Although events in the week before the publication of the article moved quickly, we do not find evidence of recklessness due to lack of diligence in investigating the facts.
Finally, plaintiff maintains that actual malice can be inferred from the rejection by the News of evidence favorable to him when it accused him of buying and selling paroles. Plaintiff points out that he is a lawyer entitled to represent inmates before the parole board, that he accepted money from King to represent Harding, that he repeatedly promised to return the money if unsuccessful, and that the law enforcement authorities' decision not to arrest him was evidence of his innocence of any wrongdoing.
In Goldwater v. Ginzburg, 414 F.2d 324 (2d Cir.1969), cert. denied, 396 U.S. 1049, 90 S.Ct. 701, 24 L.Ed.2d 695 (1970), the defendants decided to devote an issue of their magazine to Senator Goldwater after his nomination at the 1964 Republican convention. Before any research had been done on the article, one of the defendants wrote in a letter that the article would conclude that "Goldwater is so belligerent, suspicious, hot-tempered, and rigid because he has deep-seated doubts about his masculinity." 484 F.2d at 328. Questions were sent to psychiatrists and the results of this poll were published. Defendants had no training in polling techniques. While the poll was being conducted, reputable psychiatrists and psychiatric professional associations sent defendants letters denying the validity of the project. The responses to the questionnaire were edited in such a way as to delete responses favorable to plaintiff, especially statements questioning the assertion that plaintiff had suffered two nervous breakdowns. One of the defendants added phrases, sentences, and paragraphs to the letters, some of which he wrote himself and some of which he claimed to have taken from other letters which he could not identify. Most of the letters were published without any indication of deletions or additions. The court found sufficient evidence of actual malice on these facts.
*268 However, in New York Times Co. v. Connor, 365 F.2d 567, 576 (5th Cir.1966), the fifth circuit commended the reporting practices of the defendant and stated:
"While verification of the facts remains an important reporting standard, a reporter, without `a high degree of awareness of their probable falsity,' may rely on statements made by a single source even though they reflect only one side of the story without fear of libel prosecution by a public official." (Emphasis added.)
In the case before us, we find that defendants did not overstep the bounds of constitutional protection. While the defendants knew that plaintiff was a lawyer who could represent clients before the parole board,[3] they also knew that plaintiff had not filed the required disclosure statement with the Ethics Commission.[4] Furthermore, they knew that plaintiff had denied both to Harding and to Winne that he was representing Harding. He also denied that he had met with King and accepted money from him on Harding's behalf. King's statement that the deal must be handled "under the table" was corroborated by plaintiff's reluctance to speak with Harding and answer his questions. This conduct is certainly not typical of a normal attorney-client relationship.
We are also not persuaded that plaintiff's frequent statements that he could not split a fee with King were sufficient to cause the News to have serious doubts about the validity of its conclusion. Plaintiff accepted $1,500 from King knowing that King had gotten $3,000 from Winne. When read in context, plaintiff's assertions that he could not split a fee with King were merely a way of telling King that plaintiff would not give him any of the $1,500 plaintiff had just accepted.
Likewise, plaintiff's frequent promises to return the money if unable to secure the parole are not exculpatory; returning the money would not legitimate an attempt to use his influence to secure a parole even if his attempt was unsuccessful.
Finally, the decision of law enforcement officials not to arrest plaintiff after his August 2 meeting with King was known by defendants to be a decision that there was not enough evidence to prosecute at that time rather than an exoneration of plaintiff. According to both Winne and Krebs, the Montgomery County district attorney indicated at the August 6 meeting in Clanton that the investigation of plaintiff was continuing.
We do not imply that plaintiff is guilty of any illegal or unethical conduct, because that issue is not before us. We do, however, conclude that, based on the information available at the time, as a matter of constitutional law, there is no clear and convincing evidence that the News published the articles or the headlines knowing that they were false or with reckless disregard of their falsity.
Let the judgment be affirmed.
AFFIRMED.
TORBERT, C.J., and MADDOX, SHORES, ADAMS and HOUSTON, JJ., concur.
FAULKNER, JONES and ALMON, JJ., dissent.
*269 ALMON, Justice (dissenting).
I disagree with the holding of the majority that Pemberton did not present sufficient evidence to withstand a motion for JNOV. The articles published by the Birmingham News implicated Pemberton in the criminal activity of buying and selling paroles, even though the News had no evidence he had done anything illegal. Those responsible for the story knew he was an attorney and could legitimately represent clients for a fee before the parole board. They also knew that their only information linking Pemberton to any impropriety came from a highly unreliable source.
James Jacobson, the editor-in-chief of the Birmingham News, and Clark Stallworth, the associate editor who worked with Winne throughout the investigation, made the final decisions on publishing the parole stories. The News editors chose to run the article about Pemberton at the top of the front page with a large headline reading, "House clerk helps arrange paroles, News-launched investigation reveals." Next to the article was a picture of Pemberton. Evidence of actual malice may come from the writing of the headline to go with an article. Hunt v. Liberty Lobby, 720 F.2d 631, 646 (11th Cir.1983).
Immediately below the article on Pemberton was a story about the arrest of Andrew Cooper for accepting bribes to obtain a parole for a prisoner. The headline for this article was, "Deputy prison commissioner quits after bribe arrest." In the center of the page, also beneath the article on Pemberton, was a picture of Cooper being taken into the courthouse by the police. Beneath Pemberton's picture was an article headlined "Long wait, delays ... call came." This article described the reporter's contacts with a middleman in an attempt to buy a parole. At the bottom of the page was an article by Stallworth entitled "Paroles for sale?" The defamatory impact of an article may come from the context in which it is placed. Golden Bear Distr. Systems of Texas, Inc. v. Chase Revel, Inc., 708 F.2d 944 (5th Cir.1983); Braun v. Flynt, 726 F.2d 245 (5th Cir. 1984).
The only informant to say that Pemberton was involved in illegal efforts to obtain paroles was James King, whose credibility was too much in doubt for the News to consider him a reliable source. Not only was he a convicted criminal, but also he had lied to Winne and the others in the investigation. He had said the entire $3000 would go to his contact, but he immediately spent much of it on himself. King also named two different individuals as his contact. "[R]ecklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." St. Amant v. Thompson, 390 U.S. 727, 730, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968), citing Curtis Publishing Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967).
Prior to giving King the money, Winne insisted on speaking to the official who was to receive the money. Law enforcement officers monitoring the telephone conversation later said that the voice was not Pemberton's, and Winne informed Stallworth of this fact. Nevertheless, the article on Winne's investigation states that Winne "was to meet with the middle-man who would take $3,000 cash to a top state official he would not name (though other sources had)...." The article proceeded to describe the telephone conversation, including the statement that "the voice assured me it knew the right people to pay off to get a parole." The article later identified Pemberton as King's contact, but did not mention that the voice on the phone was not Pemberton's or that King had first named Ealon Lambert as his contact.
When King received the money, he did not go directly to his contact. Instead, he used part of the money to buy himself a truck and then took his wife out to dinner. Officers from the Governor's Task Force on Crime and Corruption followed King and his wife and arrested them when they went home. When the officers questioned King that night at a Birmingham police station, they told him if he did not cooperate *270 with them he could be prosecuted for theft and sent to jail for life without parole as a habitual offender. He identified his contact as Ealon Lambert. The Task Force officers placed King and his wife in a motel room for the night, with the telephone disconnected. The next morning, King changed his story and said that Pemberton was his contact. Winne and Stallworth knew that King had at first named Lambert as his contact and had only named Pemberton later. The jury could have determined that the News acted with reckless disregard of the truth or falsity of its publication because it relied on King's information given under these circumstances.
King later met with Pemberton. Pemberton accepted $1500 to represent the inmate. The attorney monitoring the conversation for the Department of Public Safety determined that there was no violation of the criminal law. Winne, Stallworth, and Jacobson all knew of this determination.
Winne's inquiries at the Parole Board and the Ethics Commission had revealed only three or four parole cases in which Pemberton was involved. The Pemberton article implied that these paroles took place under suspicious circumstances, but the parole records do not bear out this charge. For example, the article states that the routine parole date for one of the inmates represented by Pemberton was November 1979 when in fact it was March 1978. The inmate was paroled in April 1978. As to another inmate for whom Pemberton telephoned the parole board, the article merely stated that "There is no indication whether money was paid him," when in fact both the parolee and her aunt had told Winne that Pemberton had not been paid any money. The article also quotes a source as saying that Pemberton called the parole board regularly, "sometimes up to 20 times a month." It did not mention that legislators frequently referred calls from their constituents about inmates to Pemberton. Pemberton, as Clerk of the House, made these inquiries for his employers, the members of the House of Representatives.
When asked whether he knew the article was accusing Pemberton of selling paroles, Stallworth answered, "I think that's a fair implication." Stallworth also testified that he thought it was fair to call Pemberton for his comments at 5 a.m. immediately prior to the printing of the article.
The News published the Pemberton story on Saturday, August 8, because of Cooper's arrest on Friday, August 7. Winne was in Montgomery on Friday for the arrest of Cooper and saw a Montgomery television reporter at the district attorney's office. He drove to Birmingham that night and spent the whole night writing the Pemberton story so it could be released the next morning. Stallworth came in to the News offices at 3 a.m. and told Winne to call Pemberton for comments. Winne called Pemberton at 5 a.m. and Ealon Lambert at 5:30. Stallworth called Jacobson to the office to review the story before the printing deadline around 6:30 or 7:00. The evidence reveals no connection whatsoever between the allegations against Cooper and the allegations concerning Pemberton.
The record contains sufficient evidence that the News acted with at least reckless disregard of the truth or falsity of its allegations that Pemberton was involved in illegal activity. I therefore would reverse the trial court's order granting judgment notwithstanding the verdict.
FAULKNER and JONES, JJ., concur.
NOTES
[1] Although Winne was a defendant below, on appeal plaintiff does not argue that the judgment in favor of Winne should be reversed.
[2] This standard was subsequently rejected by the Court when it decided that public figures must make the same showing of actual malice as public officials. See Hunt v. Liberty Lobby, 720 F.2d 631, 642 (11th Cir.1983). However, the fact that the same result can be reached on these facts using an actual malice standard is clear from the opinion of Chief Justice Warren. Butts, 388 U.S. at 165, 169-70, 87 S.Ct. at 1998-99 (Warren, C.J., concurring in the result).
[3] The lead article stated: "As an attorney, Pemberton can represent clients before the parole board for a fee if he files the proper papers with the Ethics Commission each time he does so." See Code of 1975, § 36-25-10.
[4] At trial, there was introduced a letter from plaintiff to Melvin Cooper of the Ethics Commission, which stated:

"I have been retained to represent Mr. James Harding at a hearing to be held before the Pardon and Parole Board. I believe that Mr. Harding can be represented as adequately and affectively [sic] by members of his family as he can by me as his attorney. I am, therefore, returning the retainer and declining to represent Mr. Harding in this Matter."
Although the letter was dated August 7, 1981, the postmark on the accompanying envelope was August 8, the day the articles appeared in the newspaper. The letter was received by the Ethics Commission on August 10. There is no evidence that the News knew of the existence of this letter when it published the articles. Winne testified that he checked with the Ethics Commission on the afternoon of August 7 to see if a disclosure had been filed by plaintiff.