ALMON, Justice.
This is an appeal from a judgment of the Circuit Court of Jefferson County upholding the validity of certain actions of the Birmingham Racing Commission and ruling that Article I, § 22, of the Constitution of Alabama of 1901 was not violated.
This Court adopts the opinion and judgment of Judge Marvin Chemer rendered on September 16, 1994, as the opinion of this Court:
“This case was submitted for decision by this Court following a trial on the merits on July 5,1994.
“Play Fair Racing, Inc. (‘Play Fair’), was represented by William J. Baxley. Birmingham Racing Commission (‘Commission’) was represented by James C. Barton and Robert S. Vance, Jr. Jefferson County Racing Association, Inc. (‘JCRA’), was represented by William M. Slaughter and G. David Johnston.
“All of the parties in this action have stipulated to undisputed facts set out in this Court’s pretrial order of February 17, 1994. This ease has now been submitted for decision on the stipulated facts set out in that order and on the evidence submitted at the time of the trial.
“Play Fair says in its complaint that it was formed for the express purpose of applying for operator’s licenses to conduct horse racing and greyhound racing in Jefferson County and that it intended to file an application for such license if permitted to do so.
“Play Fair says that the award by the Commission of the greyhound racing license to JCRA was invalid and seeks an order from this Court requiring the Commission to revoke the award of that license and to require the Commission to consider applications of all interested parties in an open competitive bidding process.
“As a basis for its claims, Play Fair says that the greyhound operator’s license was granted to JCRA as a result of a ‘controlled selection process,’ pursuant to § ll-65-14(f), Alabama Code 1975, without allowing free and open competition from other interested persons. Play Fair says that § 11-65-14(0 ⅛ unconstitutional because it violates Article I, Section 22, of the Alabama Constitution of 1901 which provides in part:
“ ‘(N)o ... law ... making any ... exclusive grants of special privileges ... shall be passed by the legislature.’
“In an amendment to its complaint, Play Fair says that the decision of the Commission on July 12, 1992, to table Play Fair’s application submitted that day and to grant the greyhound racing license to JCRA was arbitrary, unreasonable and contrary to the provisions of State law.
“Although Play Fair’s complaint was only addressed to the Commission, this Court by consent granted the motion filed by JCRA for leave to intervene as a defendant in this case.
“In its defense, the Commission says that Section 22 of the Alabama Constitution does not apply to it because it is a public corporation rather than an agency of the State of Alabama. The Commission also says that the regulation of horse racing, greyhound racing, and pari-mutuel gambling are beyond the scope of the restrictions of Section 22. The Commission also says that in early November 1991, the Commission did publicly solicit applications from persons interested in conducting horse racing in Birmingham; that JCRA submitted its application for a horse racing facility license before the deadline for filing such applications and that the Commission did approve JCRA’s application at the meeting of the Commission held on June 12,1992.

“FACTS WHICH ABE NOT IN DISPUTE

“After the enactment of Act No. 84r-131 (the ‘Racing Act’), a 1984 referendum in Birmingham and Jefferson County approved horse racing and pari-mutuel wagering on horse races. The Commission was then incorporated with the power to award horse racing owner and operator licenses to qualified applicants. It is the position of the Commission that it has not received any funding or directives concerning its operations from the State of Alabama, Jefferson County, or the City of *10 Birmingham since its incorporation. No evidence has been produced to the contrary.
“The Birmingham Turf Club, Ltd., formed in November, 1984, received the horse racing owner’s license from the Commission. Its general partner, the Birmingham Turf Club, Inc., received the operator’s license. The limited partnership and its general partner are hereafter referred to collectively as the ‘Turf Club.’ These licensees spent over $60 million to construct the Birmingham horse racing facility, with governmental entities spending over $10 million to provide roads, sewers and other public improvements necessary for the use of the facility.
“Horse raeing began on March 3, 1987. The Turf Club experienced a severe liquidity problem from the outset, losing over $16 million in 1987.
“In 1988, the Turf Club was unable to reopen the racing facility for the raeing season that year. In 1988, even with no racing dates, the Turf Club lost over $10 million.
“On August 29, 1988, the Birmingham Turf Club filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the Northern District of Alabama. On September 1, 1988, AmSouth Bank moved the bankruptcy court for leave to foreclose on mortgages executed by the Turf Club as security for the indebtedness owed to AmSouth. After a number of hearings, the bankruptcy court determined the facility value was approximately $20 million.
“The bankruptcy court subsequently found that that horse raeing operator’s license was an asset of the estate, and the Commission’s revocation (occurring after the bankruptcy filing) was void. The bankruptcy court also held that Delaware North and its subsidiary, Alabama Sports Service, must apply with the Commission to obtain approval of proposed agreements with the debtors. After the Commission denied approval, the bankruptcy court ordered reconsideration, and the Commission eventually approved Delaware North’s application for racing dates.
“The bankruptcy court entered an order confirming Turf Club’s joint plan of reorganization on April 4, 1989. The racing facility reopened on May 26, 1989, under the management of Delaware North and Alabama Sports Service. The handle from the 1989 racing season was sufficient to pay the 1990 minimum payments owing to AmSouth Bank, but Delaware North continued to sustain substantial operating losses. In 1990, the operating revenues were not sufficient to make the 1991 minimum payments owing to AmSouth Bank.
“In September 1990, Delaware North advised debtors that it would not provide the funds necessary to make the 1991 bank payments to AmSouth, due on April 1, 1991, unless it obtained the right to conduct dog racing as well, something that it had not been able to do.
“In a January 22, 1991, meeting, Delaware North and the debtors advised the Commission that they would not seek any live racing dates in July 1991. Failure to seek live racing dates was a violation of the regulations promulgated by the Commission.
“In documents filed with the bankruptcy court in February and March 1991, Turf Club sought a restructuring of the reorganization plan previously approved by the bankruptcy court. The Turf Club stated that the racing facility could not be operated successfully under the existing joint plan unless dog racing was also permitted. Under the proposed modifications, the Turf Club sought approval by the bankruptcy court of a new plan under which Birmingham Sports Management, Inc., a company controlled by Milton McGregor, would become operator of the facility upon approval of greyhound racing by a county referendum. If the requisite legislation was not passed, or referendum approval was not received, a forbearance agreement among the interested parties would expire within fifteen days, and AmSouth would then be entitled to commence foreclosure proceedings against the racing facility.
“By Commission Resolution 03-07-91, the Commission consented to the proposed *11 relationship between Turf Club and Birmingham Sports Management.
“On April 10,1991, the bankruptcy court approved the modification of the joint plan of reorganization.
“Upon its enactment on June 28, 1991, Act No. 91-187, effected changes to the existing racing act to permit greyhound racing, provided the voters of Birmingham and of Jefferson County approved greyhound racing by a public referendum. The first public referendum was held on August 28, 1991, on the issue whether to approve greyhound racing and the racing facility. Greyhound racing was not approved. As a consequence of the failed August 1991 referendum and the resulting termination of the pending modified bankruptcy plan of reorganization, the Turf Club surrendered its licenses to the Commission on October 4,1991.
“In October 1991, AmSouth Bank entered into a sale and financing agreement (the ‘Sale Agreement’) with Milton McGre-gor and JCRA under which AmSouth agreed that it would, upon acquiring ownership of the facility by foreclosure, sell the facility to JCRA, subject to the conditions of the sale agreement. Those conditions included: (1) authorization of greyhound racing by a second referendum that could be held in 1992 pursuant to Act No. 91-187, and (2) the condition that the Commission award a license to JCRA to conduct greyhound racing if greyhound racing was approved by the electorate of Jefferson County.
“In early November 1991, the Commission publicly solicited applications from all persons interested in conducting horse racing in Jefferson County. The Commission’s efforts to publicize its requests for applications emphasized that the deadline for filing such applications was December 2,1991.
“On December 2,1991, JCRA submitted an application to the Commission for a horse racing facility license and also an application for an operator’s license to conduct both live and simulcast horse racing at the racing facility. In its application, JCRA requested that the Commission enter into an agreement for the award to JCRA of an operator’s license to conduct greyhound racing if and when the Jefferson County electorate approved greyhound racing. No other application for horse racing was received by the Commission as of December 2, 1991. However, Mignon Smith on that date requested that she and her associations be allowed a thirty-day extension to submit an application. The Commission then decided in an open public meeting to receive any other applications until it was in a position to take official action on JCRA’s applications. A corporation controlled by Mignon Smith subsequently submitted an application for a horse racing operator’s license on January 2,1992.
“During December 1991, AmSouth published the notices legally required for the foreclosure of its mortgages on the racing facility. On January 2, 1992, AmSouth foreclosed the second mortgage by selling the same at public auction. There were no successful bidders at this foreclosure sale other than AmSouth, which purchased the facility for the amount of the indebtedness owed by the Turf Club and secured by the second mortgage.
“On January 3, 1992, the Commission authorized the issuance to JCRA of horse racing owner’s and operator’s licenses. The Commission decided that JCRA’s application was the only acceptable application. The application submitted by Ms. Smith and her associates failed to meet several statutory criteria. No other applications were received.
“In connection with the issuance of that license and pursuant to [a] request made by JCRA in its license applications, the Commission entered into an agreement with JCRA dated January 3, 1992 (the ‘License Agreement’), under which the Commission agreed to issue to JCRA an operator’s license to conduct greyhound racing and pari-mutuel wagering thereon, provided certain conditions were met, including the approval of greyhound racing by the Jefferson County electorate by a second referendum.
*12 “JCRA thereafter assumed responsibility for the management and operation of the Birmingham racing facility and commenced simulcast programming of thoroughbred racing on January 10, 1992. Live thoroughbred racing resumed on May 1,1992.
“On April 1, 1992, the Jefferson County Commission called for a referendum under the Racing Act to be held on June 2,1992, on the issue whether greyhound racing should be approved.
“Play Fair was incorporated on May 14, 1992. On that date it commenced [this] action against the Commission.
“In the June 2, 1992, referendum, greyhound racing was approved, with fifty-six percent of the votes cast in favor, and forty-four percent in opposition.
“On June 3, 1992, JCRA filed a verified application for an operator’s license to conduct greyhound racing. The Commission scheduled its consideration of JCRA’s application on its agenda at its regularly scheduled monthly meeting on June 12, 1992. On June 12, 1992, and before the hearing, the Commission received Play Fair’s application for a greyhound racing operator’s license. At the hearing, the Commission tabled the application of Play Fair. It accepted the license application of JCRA and awarded the greyhound racing operator’s license to JCRA.
“It is not contested by the parties that the Commission was established and authorized pursuant to the Racing Act, § 11— 65-1, et seq., Alabama Code 1975. Play Fair does not contest the award by the Commission of the horse racing owner’s and operator’s licenses to JCRA in January 1992.
“It is further uncontested that JCRA is the legal owner of the racing facility, which it purchased from AmSouth Bank in 1992. Finally, it is uncontested that the qualified voters of Jefferson County, Alabama, by a majority vote at the referendum conducted on June 2,1992, authorized greyhound racing pursuant to § 11-65-4 (as amended by Act No. 91-187), Alabama Code 1975.
“Play Fair argues that § ll-65-14(f) establishes a ‘controlled selection process’ for the award of a license by the Commission and is therefore in violation of Section 22 of the Alabama Constitution. Play Fair says further that the Commission’s refusal to consider the application of Play Fair for a greyhound operator’s license in June 1992 was unreasonable, capricious and arbitrary.
“At the time of the trial, Play Fair submitted as evidence of its claims newspaper accounts and other documents relating to the charge that Milton McGregor was first able to block approval for greyhound racing previously sought by Delaware North, AmSouth and others and stated publicly that he had enough influence over the legislature to prevent greyhound racing in Jefferson County from ever passing legislative muster. Play Fair also says that after the Commission executed the license agreement with JCRA, McGregor then employed his influence in the Alabama legislature to secure passage of legislation allowing greyhound racing in Jefferson County; that when Play Fair attempted to compete with JCRA by applying for licenses, the Commission publicly stated its hands were tied by the legislation and the licensing agreement executed with JCRA.
“The evidence submitted in support of these claims involved for the most part newspaper accounts of statements made by McGregor and others that McGregor used his influence with the Alabama legislature to secure passage of the 1991 amendments to the Racing Act.
“In the first place, statements of influence of McGregor over the legislature are conclusionary. The only evidence supporting such claim is the action of the legislature itself in enacting the legislation which is the source of the present controversy.
“Secondly, even if evidence of the passage of the legislation was in itself sufficient to establish influence of McGregor over members of the legislature, that would not be a basis in the absence of corruption or bribery for attacking the validity of the legislation.
“In Lake Country Estates, Inc. v. Tahoe Regional Planning Agency, 440 U.S. 391, 59 L.Ed.2d 401, 99 S.Ct. 1171 (1979), the *13 United States Supreme Court held that persons are absolutely immune from actions taken in their legislative capacities.
“In James v. Todd, 267 Ala. 496, 506, 103 So.2d 19 (1958), a Tennessee and five Mississippi milk producers filed a class action seeking a declaratory judgment that an act passed by the legislature regulating the production, processing and distribution of milk products was unconstitutional and a burden on interstate commerce. Affirming the decision of the trial court, the supreme court concluded that the legislation did not violate the out-of-state milk producers’ rights and was valid. In that same decision, the supreme court referred to the assignments of error made against the out-of-state milk producers because the trial court refused to permit the introduction of testimony of four members of the legislature concerning the consideration and passage of the legislation by that body. The supreme court indicated by its opinion that the questions and answers of the witnesses showed an attempt to have them express their conclusions as to the motive, purpose and intent of the legislature in passing the act and to show that such was different from that expressed in the act itself. The supreme court agreed that such evidence could not be admissible. It quoted with approval from its earlier decision in Morgan County v. Edmonson, 238 Ala. 522, 192 So. 274, 276 [(1939)], as follows:
“‘It is of course a well settled rule that in determining the validity of an enactment, the judiciary will not inquire into the motives or reasons of the legislature or the members thereof. 16 Corpus Juris Secundum, Constitutional Law, § 154, p. 487. “The judicial department cannot control legislative discretion, nor inquire into the motives of legislators.” ’
“Other decisions referring to the absolute immunity of members of the legislature in connection with the performance of legislative functions include Point Properties, Inc. v. Anderson, 584 So.2d 1332,1336 (Ala.1991); Marion v. Hall, 429 So.2d 937 (Ala.1983).
“Play Fair’s counsel also says that entities controlled by McGregor entered into an agreement with the Commission in the Spring of 1991 that committed the Commission to award a future greyhound racing license to McGregor’s company. The 1991 agreement between the Commission and Birmingham Sports Management (McGregor’s company) was made in the context of the pending bankruptcy proceeding in order to effectuate the modified plan of reorganization for the benefit of the Turf Club and its stockholders. Both the modified plan of reorganization and the 1991 agreement were terminated when voters of Jefferson County rejected greyhound racing in the August 1991 referendum.

“SECTION 22 OF THE ALABAMA CONSTITUTION

“The Commission is a public corporation and not a government entity. It is not subject to the provisions of Section 22 of the Alabama Constitution. Therefore, § ll-65-14(f), Alabama Code 1975, is not invalid as a violation of Section 22.
“In Hospital Systems, Inc. v. Hill Rom, Inc., 545 So.2d 1324 (Ala.1989), the Healthcare Authority of Athens and Limestone County (‘Authority’) invited bids for the alteration and expansion of its facilities in Athens, Alabama. Hospital Systems and Hill Rom, manufacturers of patient head-wall systems, were both listed as acceptable bidders by the architectural firm retained by the hospital for the renovation. Both submitted bids for the installation of twenty-nine patient headwall systems. Hill Rom’s bid exceeded the overall base bid of Hospital Systems by approximately $52,460.00. The Authority informed Hospital Systems that it had awarded the contract for the patient headwall systems to Hill Rom because the design of the system offered by Hill Rom most closely met the specifications and quality desired by the hospital.
“Hospital Systems filed suit, saying that the awarding of the contract to Hill Rom violated Alabama’s competitive bid law (§ 41-16-50, Alabama Code 1975). Hill *14 Rom and the Authority answered that under § 22-21-3335, Alabama Code 1975, the Authority was exempt from the competitive bid law. On appeal from the granting of summary judgment against it, Hospital Systems asserted as one of the grounds for appeal that § 22-21-335 violated the Alabama Constitution. Hospital Systems argued that the provision of § 22-21-335 exempting the Authority from the competitive bid law was unconstitutional as a grant of special privileges to the Authority in violation of Section 22 of the Alabama Constitution.
“Affirming the decision of the trial court in granting summary judgment, the supreme court concluded that the Authority was a health care authority and a separate entity from the State and from any local political subdivision, including a city or county within which it was organized. The supreme court held that it was not one of the governmental entities within the contemplation of the prohibitions of Section 22 of the State Constitution. The supreme court referred to other legislation creating and maintaining public authorities in Alabama which were also by statute made exempt from the competitive bid law, including airport authorities, downtown redevelopment authorities, the Alabama Shakespeare Festival Finance Authority, and the Alabama Space Science Exhibit Finance Authority. The supreme court opinion concluded:
“ We hold, therefore, that the legislation under which the Hospital is incorporated, and by which it acquires its exemption from the Competitive Bid Law, violates neither the 14th Amendment to the United States Constitution nor § 22 of the Alabama State Constitution.’
“In the present case, § 11-65-3, Alabama Code 1975, expressly states that a racing commission is a public corporation, ‘having a legal existence separate and apart from the state and any county, municipality or political subdivision.’ The statute further provides, ‘Notwithstanding any provisions hereof which connect the state with the creation and control of a commission, any commission incorporated pursuant to the provisions of this Chapter shall not be deemed to be a part of the state for any purpose but shall be treated as a public corporation and body politic separate and apart from the state.’
“This Court concludes that the Commission is a public corporation and not a governmental entity. Section 22 of the Alabama Constitution does not apply to the conduct of the Commission.
“As an alternative holding, this Court agrees with the Commission and JCRA that the Commission’s grant of licenses to JCRA under § 11 — 65—14(f), Alabama Code 1975, is within this State’s police power in connection with the regulation of gambling. Medina v. Rudman, 545 F.2d 244 (1st Cir.1976). In that case, the New Hampshire Greyhound Racing Commission refused to approve the participation by Geraldine Medina in an outstanding greyhound racing license that the Commission had issued to a corporation known as the New Hampshire Kennel Club, Inc. After the Commission refused to approve her purchase of an interest in the corporation, Medina filed suit. Affirming the decision of the trial court, the Court of Appeals for the First Circuit concluded that it was within the discretion of the Commission to withhold approval of Medina’s participation in the racing facility. The court of appeals stated in its opinion:
“ We think the state, under its police powers, is entitled, if it elects, to issue race track licenses, and to regulate participation thereunder, on a discretionary basis as it has chosen to do here. Given the social evils associated with gambling and the state’s revenue interests, the state’s choice of means in the selection of licensees is entitled to prevail over the private interests of potential investors. We do not decide if and to what extent a similar analysis would stand up if applied to another type of enterprise....’
“This Court concludes in the present case that the State’s choice of the means in the selection of licensees is also entitled to prevail over the private interest of potential investors.

*15
“THE BID PROCESS

“The evidence is undisputed that in early November, 1991, the Commission publicly solicited applications from all persons interested in conducting horse racing in Jefferson County. It was stated publicly that the deadline for filing applications was December 2, 1991. By that date only JCRA had submitted an application for a horse racing license and an operator’s license. At the same time, JCRA publicly requested that the Commission enter into an agreement for the award of a greyhound racing operator’s license if greyhound racing should be approved by public referendum.
“After extending the time for submitting applications or bids, the only other bid submitted was that of a corporation named Class Secret, Inc., owned or controlled by Mignon Smith. The Commission entered into an agreement with JCRA dated January 3, 1992, under which it agreed to provide JCRA an operator’s license to conduct greyhound racing and pari-mutuel wagering subject to approval of greyhound racing by Jefferson County by a second referendum.
“JCRA began the management and operation of the racing facility on January 10, 1992. Live thoroughbred racing resumed on May 1,1992.
“It was not until May 14, 1992, that Play Fair was incorporated and on that day brought the action against the Commission.
“It is undisputed that Play Fair never responded to the invitation to bid made by the Commission initially.
“This Court concludes that it was not required by the Commission that it resubmit invitations to bid -as a basis for agreeing with JCRA that it would also award JCRA a greyhound racing license in the event that greyhound racing should ever be approved.
“In accordance with this opinion, this Court concludes that the defendants are entitled to judgment in their favor with respect to the claims asserted by Play Fair Racing, Inc., in this case.
“Accordingly, judgment is hereby rendered in favor of the defendants, the Birmingham Racing Commission and Jefferson County Racing Association, Inc., and denying the relief sought in this case by the plaintiff, Play Fair Racing, Inc.”
The judgment is hereby affirmed.
AFFIRMED.
MADDOX, HOUSTON, COOK, and BUTTS, JJ., concur.